**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Victor PRIETO, Defendant–Appellant.**

No. 02CA2093.

Colorado Court of Appeals, Division IV.

April 21, 2005.

Certiorari Denied Dec. 5, 2005.

John W. Suthers, Attorney General, Anthony J. Navarro, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Jason C. Middleton, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by: Judge ROY.

Defendant, Victor Prieto, appeals the judgment of conviction entered on a jury verdict finding him guilty of felony first degree murder, under the influence vehicular homicide, reckless vehicular homicide, second degree burglary, criminal mischief, and theft. We affirm.

On the night of the crime, defendant was in a vehicle that rammed the side of a store. Certain merchandise from the store was removed. Shortly thereafter, and while fleeing the burglary, the vehicle ran a stop sign in a nearby residential area and, going an estimated speed of fifty to sixty miles per hour, collided with a vehicle driven by the victim, killing her almost instantly.

Defendant, who suffered a broken leg, was taken by ambulance to the hospital and was treated for his injuries. The police investigator who accompanied defendant to the hospital observed slurred speech and a smell of alcohol on defendant. Blood alcohol tests revealed that defendant had a blood alcohol level of .134.

Defendant's primary defense was insufficient evidence that he was the driver. Defendant was convicted and sentenced to life in prison without parole for felony first degree murder. This appeal followed.

## I.

Defendant initially asserts, as he did below, that his constitutional right to equal protection was violated because felony first degree murder carries a greater punishment than aggravated vehicular homicide even though they proscribe identical conduct. We disagree.

Equal protection of the law is guaranteed by the United States Constitution and by the Due Process Clause of the Colorado Constitution. U.S. Const. amend. XIV; Colo. Const. art. II, § 25. The United States Supreme Court has held that statutes proscribing identical conduct but authorizing different penalties are not violative of federal equal protection guarantees. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). Because Colorado has taken a more expansive view, we analyze defendant's claim under the Colorado Constitution. *See People v. Stewart*, 55 P.3d 107 (Colo.2002).

■ Equal protection assures like treatment to those who are similarly situated. *People v. Mozee*, 723 P.2d 117 (Colo.1986). "When two criminal statutes prescribe different penalties for identical conduct, a defendant convicted and sentenced under the harsher statute is denied equal protection of the laws." *People v. Mozee, supra,* 723 P.2d at 126; *see People v. Haymaker*, 716 P.2d 110, 115 (Colo.1986).

■ If, however, the statutory classifications of crimes are based upon differences that are both real in fact and reasonably related to the purposes of the legislation, equal protection principles are not offended. The General Assembly may establish harsher penalties for more egregious conduct even if the differences are only a matter of degree. *People v. Mozee, supra.* Furthermore, statutes that prescribe different sanctions for what ostensibly might be different acts, but offer no rational standard for distinguishing the disparate punishment, run counter to equal protection guarantees. *People v. Wilhelm*, 676 P.2d 702 (Colo.1984). However, it is equally well established that a single act may violate more than one criminal statute. *People v. Owens*, 670 P.2d 1233 (Colo.1983).

■ Colorado employs the elemental analysis in determining whether there is an equal protection violation. Under the elemental analysis, the issue is not whether there may be several offenses with differing penalties that might apply to the defendant's conduct and from which the prosecuting attorney may choose in making a charging decision, but whether there are distinctions between the elements of the offenses as defined by the statutes. *People v. Stewart, supra.*

The statute for first degree murder, which includes the felony first degree murder provision, states:

A person commits the crime of murder in the first degree if ... [a]cting either alone or with one or more persons, he or she commits or attempts to commit arson, robbery, burglary, kidnapping, sexual assault ... or the crime· of escape as provided in section 18–8–208, and, in the course of or in furtherance of the crime that he or she is committing or attempting to commit, or of immediate flight therefrom, the death of a person, other than one of the participants, is caused by anyone.

Section 18–3–102(1)(b), C.R.S.2004. First degree murder is a class 1 felony, § 18–3–102(3), C.R.S.2004, and carries a minimum sentence of life imprisonment without the possibility of parole and a maximum sentence of death. Section 18–1.3–401(1)(a)(V)(A), (4), C.R.S.2004.

The relevant portion of the vehicular homicide statute provides:

(1)(a) If a person operates or drives a motor vehicle in a reckless manner, and such conduct is the proximate cause of the death of another, such person commits vehicular homicide.

(b)(I) If a person operates or drives a motor vehicle while under the influence of alcohol or one or more drugs, or a combination of both alcohol and one or more drugs, and such conduct is the proximate cause of the death of another, such person commits vehicular homicide. This is a strict liability crime.

Section 18–3–106, C.R.S.2004.

Reckless vehicular homicide is a class 4 felony punishable by imprisonment for a minimum of two and a maximum of six years with three years of mandatory parole. Under the influence vehicular homicide is a class 3 felony punishable by imprisonment for a minimum of four years and a maximum of twelve years with five years of mandatory parole. Sections 18–1.3–401(1)(a)(V)(A), 18–3–106(1)(c), C.R.S.2004.

In 1998, the legislature enacted an enhanced sentencing provision applicable to vehicular homicide under § 18–3–106(1)(a) or (1)(b):

If the defendant is convicted of class 4 or class 3 felony vehicular homicide under section 18–3–106(1)(a) or (1)(b), and while committing vehicular homicide the defendant was in immediate flight from the commission of another felony, the court shall be required to sentence the defendant to the department of corrections for a term of at least the midpoint in the presumptive range but not more than twice the maximum term authorized in the presumptive range for the punishment of the class of felony vehicular homicide of which the defendant is convicted.

Section 18–1.3–401(8)(g), C.R.S.2004.

Thus, upon merger of the vehicular homicide convictions, defendant was subject to a sentence of a minimum of eight years and a maximum of twenty-four years with five years of mandatory parole. However, at the sentencing hearing, the trial court merged both the vehicular homicide convictions and the burglary conviction into the felony first degree murder conviction and sentenced defendant to life in prison without the possibility of parole.

## A.

Defendant first contends that the statutes offend equal protection principles because they proscribe identical conduct with widely disparate sentences. We do not agree.

In determining whether two statutes proscribe identical conduct, we begin by analyzing the elements of each. When construing a statute, we must give effect to legislative intent. To determine that intent, we first look to the language of the statute, giving words and phrases their ordinary and commonly understood meaning. Our analysis starts with the presumption that the statutes are constitutional. A party challenging the constitutionality of a statute has the burden of proving that claim beyond a reasonable doubt. *People v. Stewart, supra.*

*People v. Stewart, supra,* is particularly instructive. In *Stewart,* as pertinent here, the defendant seriously injured the victim with his motor vehicle. He was convicted of reckless second degree assault, which requires that the offender recklessly cause serious bodily injury with a deadly weapon,

there a motor vehicle. *See* § 18–3–203(1)(d), C.R.S.2004. Reckless second degree assault is a class 4 felony. However, a sentence to imprisonment in the aggravated range is required. Sections 18–1.3–406, 18–3–203(2)(c), C.R.S.2004. By contrast, reckless vehicular assault requires that the offender drive or operate a motor vehicle in a reckless manner, proximately causing serious bodily injury to another. It is a class 5 felony, which does not mandate incarceration. Section 18–3–205, C.R.S.2004.

In *Stewart*, the supreme court rejected the defendant's equal protection argument for three reasons: (1) reckless vehicular assault requires the operation of a motor vehicle, and reckless second degree assault does not; (2) reckless vehicular assault requires proximate cause, and reckless second degree assault requires only cause; and (3) reckless vehicular assault requires a motor vehicle, and reckless second degree assault requires a deadly weapon, which may, but need not, be a motor vehicle.

Here, the felony first degree murder statute requires a predicate offense of arson, robbery, burglary, kidnapping, sexual assault, or escape. And, though no mens rea is required with respect to the death, felony first degree murder requires that the actor act knowingly in perpetrating one of the predicate offenses. *People v. Jones*, 990 P.2d 1098 (Colo.App.1999). By contrast, the intent required for vehicular homicide can be either reckless or strict liability (when driving under the influence of alcohol or drugs), requiring only voluntary conduct. *Frazier v. People*, 90 P.3d 807 (Colo.2004).

An actus reus of greater specificity will distinguish prohibited conduct. *See People v. Czajkowski*, 193 Colo. 352, 568 P.2d 23 (1977) (theft of auto parts deemed more specific than theft generally; no violation of equal protection to assess a greater sanction for the former). For felony first degree murder, the act can be anything that causes the death of a nonparticipant. By contrast, vehicular homicide requires operation of a motor vehicle.

Further, there is a difference in causation. Causation is defined as an "act or failure to act which in natural and probable sequence produced the claimed injury." *People v. Stewart, supra*, 55 P.3d at 116 (quoting CJI Crim. 9:10, 9(4) (1983)). Thus, under felony first degree murder, any act or omission may be the cause of the death involved. By contrast, the element of causation in vehicular homicide is one of proximate cause. "Proximate cause ... 'means a cause which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have been sustained.'" *People v. Stewart, supra*, 55 P.3d at 116 (quoting CJI Crim. 9:10, 9(3)).

Finally, the predicate felonies for felony first degree murder are limited to those generally recognized as posing a high risk of injury or death to the victim. Reckless and under the influence vehicular homicide require the immediate flight from any felony, including, as here, a predicate for felony first degree murder.

Here, the key inquiry is whether the disparity in the classification of felony first degree murder and immediate flight vehicular homicide is real in fact and reasonably related to the purposes of the legislation. The General Assembly may prescribe a more severe penalty for felony first degree murder than for immediate flight vehicular homicide if it believes that felony murder has graver societal consequences. The purpose of the felony murder statute is to classify as murder every homicide committed in the perpetration of or attempt to perpetrate the identified predicate felonies. *Frady v. People*, 96 Colo. 43, 40 P.2d 606 (1934).

Thus, the General Assembly, in seeking to discourage death as an outcome when an actor attempts to commit or commits one of the predicate felonies, imposes a first degree murder punishment should a death occur. The General Assembly could reasonably believe that death committed in this fashion is more egregious than death which occurs in the course of vehicular homicide because, among other things, the predicate crimes for felony first degree murder are generally recognized as having a high risk of serious injury or death to innocent parties. *Auman v. People*, 109 P.3d 647 (Colo.2005).

Defendant asserts that § 18–1.3–401(8)(g) should be read as adding an additional element to vehicular homicide, that is, "while committing vehicular homicide the defendant was in immediate flight from the commission of another felony." Construed in this manner, according to defendant, immediate flight vehicular homicide and felony murder proscribe identical conduct but with radically different punishments. However, even as defendant characterizes the offenses, as we have already stated, the elemental test reveals meaningful distinctions between them.

Defendant contends that even if the statutes proscribe different conduct, they run afoul of equal protection because there is no rational standard by which to distinguish them. Again, we disagree.

■ The test is whether the distinction of culpability is "one without a sufficiently pragmatic difference to permit an intelligent and uniform application of the law." *People v. Marcy*, 628 P.2d 69, 78 (Colo.1981). If a person of average intelligence can reasonably distinguish the conduct proscribed by the statutes, then there is no equal protection violation. *People v. Jefferson*, 748 P.2d 1223 (Colo.1988).

As already stated, these offenses are distinguished by the level of intent, the actus reus (commission or omission), the requirement that the actor operate or drive a motor vehicle for vehicular homicide, and the predicate felonies.

We conclude that there is a valid classification here and that defendant has not met his burden of demonstrating a constitutional violation beyond a reasonable doubt.

### B.

■ Defendant also contends that the trial court improperly convicted and sentenced him for felony first degree murder, rather than under the more specific aggravated vehicular homicide statute, which was enacted to cover prosecution and punishment of vehicular homicide that occurs when in immediate flight from any felony. We disagree.

■ The enactment of a specific criminal statute does not preclude prosecution under a general criminal statute unless the language clearly evinces legislative intent to limit prosecution to the specific statute. *See People v. Smith*, 938 P.2d 111 (Colo.1997)(comprehensive Liquor Code in *People v. Bagby*, 734 P.2d 1059 (Colo.1987), and the Limited Gaming Act in *People v. Warner*, 930 P.2d 564 (Colo.1996)); *Hucal v. People*, 176 Colo. 529, 493 P.2d 23 (1971):

■ The factors for determining whether the General Assembly intended to preclude prosecution under a general statute by enacting a more specific statute include: (1) whether the specific statute invokes the full extent of state police powers; (2) whether the specific statute is part of a comprehensive regulatory scheme to control an entire substantive area of behavior; and (3) whether the specific statute carefully defines different types of offenses in detail. *People v. Smith, supra.*

Here, we are not dealing with either a comprehensive regulatory scheme or a statute that defines different types of offenses in detail.

Defendant relies upon *Whitman v. People*, 161 Colo. 110, 420 P.2d 416 (1966)(upholding felony murder conviction for death caused by high-speed flight in automobile after robbery), for the proposition that in adopting the aggravated sentence for immediate flight vehicular homicide, the legislature intended to preempt prosecution for felony murder under facts similar to those presented here. We disagree.

First, defendant misapplies the language of the sentence enhancer as an element of vehicular homicide to create a more specific offense than felony first degree murder. Second, we see nothing in the language of the vehicular homicide statute or the sentence enhancer that suggests a legislative intent to preempt the felony murder statute. Indeed, if the General Assembly intended such preemption, it certainly could have drafted the aggravated sentence enhancer using such language. Therefore, we reject defendant's argument.

## II.

Defendant next contends that the trial court erred by admitting expert testimony on elemental particle comparison by a Colorado Bureau of Investigation (CBI) chemist and fiber analysis of a CBI hair and fiber expert without adequate findings consistent with *People v. Shreck,* 22 P.3d 68 (Colo.2001). Again, we disagree.

■ Trial courts are vested with broad discretion in admitting expert testimony, and their determinations will not be overturned on review absent an abuse of discretion. *Masters v. People,* 58 P.3d 979 (Colo.2002). An abuse of discretion occurs only when the trial court's ruling was manifestly arbitrary, unreasonable, or unfair. *Wark v. McClellan,* 68 P.3d 574 (Colo.App.2003).

CRE 702 governs admission of scientific or other expert testimony. CRE 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ A trial court's inquiry should focus on reliability and relevance of the proffered testimony. In so doing, a trial court must consider: (1) the reliability of the underlying scientific principles; (2) the qualifications of the expert witness; and (3) the usefulness of the testimony to the jury. The inquiry should be broad and consider the totality of the circumstances in each case. This is a liberal standard, and the court also must ensure that admissibility comports with CRE 403. *See People v. Shreck, supra* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Finally, the trial court must issue specific findings on the CRE 702 and CRE 403 analyses. *People v. Shreck, supra.*

An expert's testimony will often rest upon information and techniques beyond the knowledge or experience of laymen. The trial court's gatekeeping function assures that specialized testimony is reliable, relevant, and helpful to the jury. *Kumho Tire*

*Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). A preliminary assessment of the scientific reasoning or methodology underlying the testimony is important to determine its validity and to determine whether such reasoning or methodology can properly be applied to the facts in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.*

### A.

■ The CBI chemist performed elemental particle analysis on two samples of dust debris. One sample was taken from broken sheetrock at the scene of the burglary, and one sample turned up as white dust on a pair of stolen jeans recovered from the vehicle. The results determined that the two samples shared the following chemical elements: sulphur, calcium, oxygen, silicon, magnesium, and aluminum. Although the expert could not opine that the two samples shared a common origin, her microscopic examination revealed certain morphological similarities.

In his motion to exclude, defendant asserted that this testimony would not be helpful to the jury and that any probative value was substantially outweighed by unfair prejudice. Defendant also asserted that because he had just received the expert's curriculum vitae and notes, he could not address the expert's qualifications or testing methods.

At the motions hearing three months later, defendant reiterated that under a CRE 403 analysis the expert's conclusions would be misleading to the jury. Defense counsel did not challenge the expert's qualifications or the underlying scientific methodology applicable to scanning electron microscopy.

The thrust of defense counsel's argument for a *Shreck* analysis was that these elements exist in any number of places in our world, not just in these two debris samples. However, defense counsel conceded that this issue may go only to the weight of the evidence. Consequently, in the absence of a reliability challenge below, we assume that defendant accepted as reliable the scientific principles underlying the proffered expert testimony. *See People v. Martinez,* 74 P.3d 316 (Colo.2003).

Therefore, we conclude that the trial court did not err in permitting the CBI chemist to testify about elemental particle analysis.

### B.

The CBI hair and fiber expert performed microscopic examinations of ten different fiber types taken from a baseball cap found in the vehicle and five different fiber types obtained from the vehicle's windshield. All five fiber types from the windshield were microscopically consistent with one fiber type from the baseball cap. Hence, the expert could only find consistency between the samples. She could not opine that the fibers embedded in the windshield were the same fibers as those in the baseball cap.

Defendant's motion asserted that because the fibers were not exact matches, this testimony would not be helpful to the jury and that any probative value was substantially outweighed by unfair prejudice. Again, the motion stated that because defendant had just received the expert's curriculum vitae and notes, he could not address the expert's testing methods or qualifications.

At the motions hearing, the fiber expert testified as to her methods, her qualifications, and the conclusions that she could or could not draw based upon her tests. Shortly thereafter, defense counsel raised the issue of reliability because some of the defining fiber characteristics, such as color, delustering, or shape, are subjective to the examiner.

The trial court relied upon a distinction drawn by the Indiana Supreme Court in *McGrew v. State*, 682 N.E.2d 1289 (Ind.1997), regarding hair comparison analysis:

> Inherent in any reliability analysis is the understanding that, as the scientific principles become more advanced and complex, the foundation required to establish reliability will necessarily become more advanced and complex as well. The converse is just as applicable, as demonstrated by the trial court's conclusion that "what we're talking about is not the traditional scientific evaluation. We are talking about simply a person's observations under a microscope."

*McGrew v. State, supra,* 682 N.E.2d at 1292. Here, as a result, the trial court concluded that the proffered testimony of the CBI fiber expert did not require a *Shreck* analysis.

We note, however, that the *Shreck* court did not make such a distinction. It held that CRE 702 is the definitive standard for determining the admissibility of scientific evidence in Colorado and that this standard includes a determination of the reliability of the underlying scientific principles. *People v. Shreck, supra.*

Nonetheless, here the trial court made findings that meet the requirements of *Shreck.* The court found that the fiber examination may be considered subjective because the expert examined the fibers through the filter of her own eye. However, the expert was trained in fiber analysis at the FBI, fiber analysis is subject to CBI standard operating procedures, the standard operating procedures used are accepted within the forensic community, and her test was subject to peer review. The court noted that although this expert was not going to render a conclusive opinion, her findings of consistency among the fibers might be helpful to the jury and certainly would be relevant.

We conclude that the court did not err in admitting the fiber expert's testimony.

### III.

Defendant's final contention is that the prosecutor's conduct during closing statements denied him a fair trial. We are not persuaded.

During rebuttal closing argument, the prosecutor remarked that the windshield had fibers from the hat. As to the particle samples from the drywall and the jeans, the prosecutor remarked that these exact elements were found in both and that "those things are the same." Defendant objects that these remarks overstated the evidence and misled the jury. Because the admission of the fiber and particle evidence was based upon the fact that the expert could not conclude that they shared a common origin, defendant contends that it was error for the prosecutor to indicate otherwise in closing argument.

We review for prosecutorial misconduct by evaluating the severity and frequency of misconduct, any curative measures taken by the trial court to alleviate the misconduct, and the likelihood that the misconduct constituted a material factor leading to the defendant's conviction. *People v. Merchant*, 983 P.2d 108 (Colo.App.1999). Moreover, the alleged improprieties must be reviewed in the context of the arguments as a whole and in light of the evidence presented. *People v. Gutierrez*, 622 P.2d 547 (Colo.1981).

Here, defendant did not object to the prosecutor's statements during closing arguments. Thus, we review under a plain error standard. This standard requires reversal only if, after review of the entire record, we can say with fair assurance that the error undermined the fundamental fairness of the trial and cast serious doubt upon the reliability of the judgment of conviction. *People v. Wilson*, 838 P.2d 284 (Colo.1992); *People v. Avila*, 944 P.2d 673 (Colo.App.1997).

Defendant relies upon *People v. Linscott*, 142 Ill.2d 22, 153 Ill.Dec. 249, 566 N.E.2d 1355 (1991), for the proposition that where the state's own expert could not conclude that there was a "match" between hair samples, it was improper for the prosecutor to remark during closing arguments that they were a match.

Here, we conclude that the prosecutor's statement that the fibers from the windshield were from the hat overstated the evidence. At trial, the fiber expert testified that the fibers were consistent. The expert could not render an opinion that they were the same.

The statement by the prosecutor that the elements on the drywall were the same elements found on the jeans was not an overstatement of the evidence and accurately represented the particle expert's testimony.

We cannot say, based upon our review of the record, that the statement concerning fibers so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. Here, DNA taken from the cap linked defendant to the baseball cap. Further, the interior impact to the windshield, attributed to being struck by the driver's head, provided further evidence from which the jury could have concluded that defendant was driving the car, without relying upon the prosecutor's inappropriate argument. Consequently, we conclude that there was no plain error.

The judgment is affirmed.

Judge WEBB and Judge GRAHAM concur.