55 P.3d 107
The PEOPLE of the State of Colorado, Petitioner/Cross-Respondent,
v.
Wayne Robert STEWART, Respondent/Cross-Petitioner.
No. 00SC672.
Supreme Court of Colorado, En Banc.
September 9, 2002.
As Modified on Denial of Rehearing September 23, and October 15, 2002.
 Ken Salazar, Attorney General, Robert M. Russel, Assistant Solicitor General, Denver, Colorado, Attorneys for Petitioner.
 David S. Kaplan, Colorado State Public Defender, Cynthia Camp, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent.
 Chief Justice MULLARKEY delivered the Opinion of the Court.
 We are reviewing the court of appeals' decision in People v. Stewart, 26 P.3d 17 (Colo.Ct.App.2000), reversing the defendant's assault conviction arising out of an incident in which the vehicle he was driving struck and seriously injured a pedestrian. The court of appeals held that Wayne Robert Stewart's conviction of reckless second degree assault with a deadly weapon, section 18-3-203(1)(d), 6 C.R.S. (2001), violates equal protection of the laws, U.S. Const. Amend. XIV; Colo. Const. Art II, Sec. 25, because it imposes a more severe penalty for the same behavior proscribed by the vehicular assault statute, section 18-3-205(1)(a), 6 C.R.S. (2001). In addition to review of this constitutional issue, we granted certiorari to consider whether (1) the court of appeals erred in finding that the trial court committed plain error by failing to give an intervening cause instruction as to second degree assault when the instruction was not requested by the defense; (2) whether the court of appeals erred when it held that an investigating officer, who was not qualified as an expert, should not have been allowed to express his opinion about how the accident occurred; and (3) whether a limited remand is required in order for the trial court to properly consider a defendant's motion for appeal bond.
 We reinstate the conviction. Because we conclude that there are reasonable distinctions between the statutes governing reckless second degree assault and vehicular assault, we find no equal protection violation. Therefore, we reverse the court of appeals' decision on this issue. Additionally, we hold that the trial court did not commit plain error in failing to instruct the jury that intervening cause constituted an affirmative defense as to second degree assault. Consequently, we reverse the court of appeals' judgment on this issue. We agree with the court of appeals that the trial court abused its discretion in permitting an investigating officer to testify about his reconstruction of the crime scene without qualifying him as an expert. Because we conclude that the error was harmless, however, no reversal of Stewart's conviction is warranted. Finally, we conclude that a limited remand is not required on the bond issue. Accordingly, we affirm the court of appeals' judgment with respect to this issue.
 I. FACTS AND PROCEEDINGS BELOW
 The crimes occurred on a Sunday evening in March 1997 when Wayne Stewart left the bar of a restaurant located in a suburban shopping center. As Stewart began to drive his sports utility vehicle out of the shopping center parking lot, he encountered three pedestrians — Richard Ehrmann, Christine Castro, and Jeffrey Pippenger, in that order — walking abreast in the middle of the driving lane. The pedestrians had just left a video rental store and, as they walked to their vehicle, they were looking up at the Hale Bopp comet streaking across the sky. The testimony of disinterested bystanders established that Stewart veered toward the pedestrians at an angle; Ehrmann, who was closest to the traffic lane, was brushed by Stewart's vehicle. A verbal altercation ensued, after which Stewart began driving back and forth at an angle and in an aggressive manner.
 The parties dispute how Ehrmann came to land on the hood of Stewart's vehicle. Stewart maintained that as he drove forward and passed Ehrmann, the victim, who was facing him, Ehrmann suddenly vaulted onto the front quarter panel, landing on the vehicle's hood. Just as suddenly, according to Stewart, Ehrmann rolled or jumped off. Stewart argued that a dent was caused by Ehrmann's buttocks as he vaulted onto the hood, landing in a seated position. The People, by contrast, contended that Ehrmann had his back to the vehicle when he was hit by it and propelled into the air, landing on the SUV's front quarter panel. They asserted that the dent was caused by Ehrmann's elbow when he was thrown onto the vehicle.
 Eyewitnesses testified that Stewart abruptly stopped his vehicle, and Ehrmann rolled off the hood, landing "hard" on the ground next to the driver's side of the SUV. Ehrmann's head landed under the SUV between the front and back wheels. There is conflicting evidence as to whether the defendant stopped his vehicle after Ehrmann rolled off. As Stewart proceeded ahead at a slow rate of speed, the rear driver's side tire ran over Ehrmann's head. Stewart testified that he neither saw Ehrmann lying on the ground after Ehrmann fell off the vehicle nor was aware that he had run over Ehrmann's head. Stewart left the scene without stopping.
 As a result of the incident, Ehrmann suffered massive brain injury and lay comatose for approximately two and one-half years. Ultimately, the victim died.
 The state charged Stewart with one count of first degree assault against Ehrmann, a class 3 felony in violation of section 18-3-202(1)(a); one count of reckless second degree assault against Ehrmann, a class 4 felony, in violation of section 18-3-203(1)(d), 6 C.R.S. (2001); four counts of violent crime, pursuant to section 16-11-309, 6 C.R.S. (2001)1; one count of vehicular assault against Ehrmann, a class 5 felony, in violation of section 18-3-205(1)(a), 6 C.R.S. (2001); and four counts of reckless endangerment against the other two pedestrians and two bystanders, a class 3 misdemeanor, in violation of section 18-3-208, 6 C.R.S. (2001). Stewart pleaded not guilty to the charges.
 At trial, the People contended that Stewart intentionally hit Ehrmann or, in the alternative, that Stewart used his vehicle to scare and intimidate Ehrmann. Stewart took the position described above that Ehrmann jumped onto Stewart's vehicle and that he was unaware that he ran over Ehrmann. The court instructed the jury on several theories of defense. Stewart asserted "intervening cause" as a defense to vehicular assault but not as to any of the other offenses charged.
 A jury convicted Stewart of reckless second degree assault of Ehrmann and two counts of reckless endangerment against the other two pedestrians. At the sentencing hearing, the trial court found that Stewart "did drive his car at Mr. Ehrmann in an act of anger," and sentenced Stewart to five years in the Department of Corrections (DOC) for the second degree assault conviction and six months on each of the reckless endangerment counts. Stewart appealed his conviction and sentence as to second degree assault only.
 The court of appeals reversed Stewart's conviction and remanded his case with directions. People v. Stewart, 26 P.3d 17 (Colo.Ct.App.2000). Four of its holdings are relevant here.
 First, it determined that second degree reckless assault with a deadly weapon is identical to reckless vehicular assault when the deadly weapon is a car. Applying Colorado's equal protection doctrine, the court concluded that the two statutes proscribe the same conduct but impose disparate penalties and that, consequently, Stewart could not be convicted of the more serious offense of second degree assault. In light of Stewart's acquittal of vehicular assault at trial, and because it deemed retrial necessary on other grounds, the court concluded that Stewart could be retried on second degree assault; if convicted, however, he could be punished only as if convicted for vehicular assault.
 Second, the court of appeals concluded that the trial court committed reversible error by failing to instruct the jury that "intervening cause" was a defense to second degree assault. This failure amounted to plain error, in the court's view, because the trial court did provide the instruction as a defense to vehicular assault, a charge of which he was acquitted.
 Third, the court of appeals concluded that the trial court should not have permitted a police officer to offer opinions about the incident without being qualified as an expert.2
 Finally, the court of appeals concluded that no remand was necessary for the trial court to retain jurisdiction to consider a defendant's application for an appeal bond filed after the direct appeal commences.
 We granted certiorari.
 II. ANALYSIS
 1. Equal Protection
 Stewart argues that his conviction for reckless second degree assault with a deadly weapon violates his right to equal protection because the statutes governing vehicular assault and reckless second degree assault with a deadly weapon proscribe the same conduct but mete out disparate punishments. He asserts that there is no rational distinction between second degree reckless assault, a class 4 felony requiring mandatory sentencing for a term of five to sixteen years,3 and vehicular assault, a class 5 felony that is punishable by one to three years of imprisonment in the presumptive range and two to six years in the aggravated range, and which neither requires a mandatory sentence nor precludes probation. The lack of any rational basis for distinguishing the two offenses, he maintains, coupled with the significant difference in penalty, renders his conviction of second degree assault violative of equal protection by penalizing him more severely for the identical criminal conduct proscribed by the lesser offense of vehicular assault. We disagree.
 The Fourteenth Amendment to the United States Constitution provides in part that no state "shall deny to any person within its jurisdiction the equal protection of the laws." A similar guarantee is implicit in the due process clause of the Colorado Constitution. Colo. Const., art. II, sec. 25. Colorado, however, has taken a stricter view of the protections afforded by our equal protection guarantee than has the United States Supreme Court in interpreting the federal Constitution. The Supreme Court has held that equal protection is not offended when statutes proscribe identical conduct but authorize different penalties. United States v. Batchelder, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).4
 By contrast, we have consistently held that if a criminal statute proscribes different penalties for identical conduct, a person convicted under the harsher penalty is denied equal protection unless there are reasonable differences or distinctions between the proscribed behavior. See, e.g., People v. Richardson, 983 P.2d 5, 6-7 (Colo. 1999); People v. District Court, 964 P.2d 498, 500-01 (Colo.1998); People v. Marcy, 628 P.2d 69, 74 (Colo.1981); People v. Estrada, 198 Colo. 188, 191, 601 P.2d 619, 621 (1979); People v. Calvaresi, 188 Colo. 277, 281-82, 534 P.2d 316, 318 (1975). The statutory classification of crimes must be based on differences that are both real in fact and also reasonably related to the general purposes of the criminal legislation. Richardson, 983 P.2d at 7; District Court, 964 P.2d at 501; Marcy, 628 P.2d at 74-75.
 Equally well established is the principle that a single act may violate more than one criminal statute. People v. Owens, 670 P.2d 1233, 1237-38 (Colo.1983); People v. Westrum, 624 P.2d 1302 (Colo.1981). We have emphasized that equal protection is offended only when two statutes forbid identical conduct. Westrum, 624 P.2d at 1303. The general assembly may establish more severe penalties for acts that it believes have graver consequences, even if the differences are only a matter of degree. People v. Mozee, 723 P.2d 117, 126 (Colo.1986); People v. Haymaker, 716 P.2d 110, 118 (Colo.1986). Similarly, we have held that the enactment of a specific criminal statute does not preclude prosecution under a general criminal statute unless the statutory language clearly indicates that the legislature intended to limit prosecution to the specific statute. People v. Smith, 938 P.2d 111, 115-16 (1997); Westrum, 624 P.2d at 1303.
 To determine whether two statutes proscribe identical conduct, we analyze the elements of each. Richardson, 983 P.2d at 7; Mozee, 723 P.2d 117. We emphasize that this task requires a facial examination of the elements comprising each crime. Because the court of appeals failed to apply the correct analysis in this case, we reject its approach and its conclusion.
 Our primary task in construing statutes is to give effect to the legislative purpose underlying the enactment. Medina v. State, 35 P.3d 443, 453 (Colo.2001). To determine legislative intent, we first look to the statutory language itself, giving words and phrases their commonly understood meaning. Padilla v. Sch. Dist. No. 1, 25 P.3d 1176, 1180 (Colo.2001). A statute should be interpreted so as to give consistent, harmonious, and sensible effect to all of its parts. People v. Rickstrew, 775 P.2d 570, 574 n. 3 (1989). In going about this task, we are mindful of the presumption that statutes are constitutional. People v. Fuller, 791 P.2d 702, 705 (Colo.1990). A party asserting the unconstitutionality of a statute has the burden of proving such claim beyond a reasonable doubt. People v. Rostad, 669 P.2d 126, 127 (1983). With these principles in mind, we now turn to the statutes.
 The crime of reckless second degree assault with a deadly weapon is defined in section 18-3-203(1)(d), 6 C.R.S. (2001), as follows: "(1) A person commits the crime of assault in the second degree if: ... (d) He recklessly causes serious bodily injury to another person by means of a deadly weapon[.]" As noted above, second degree assault is a class 4 felony carrying a mandatory sentence of five to sixteen years.
 Vehicular assault is defined in section 18-3-205, 6 C.R.S. (2001), as follows: "(1)(a) If a person operates or drives a motor vehicle in a reckless manner, and this conduct is the proximate cause of serious bodily injury to another, such person commits vehicular assault." Again, as stated above, vehicular assault is a class 5 felony permitting probation and not mandating incarceration; for those convicted of the charge and sentenced to a term of years, the presumptive sentencing range is one to three years and the aggravated sentencing range is two to six years.
 The language of the statutes differs in three primary ways. First, second degree assault applies to a range of unspecified conduct; the defendant can "recklessly cause" injury in a multitude of ways. The conduct specified in the vehicular assault statute, on the other hand, is strictly limited to "driving or operating" a motor vehicle.
 We have held that "drive" means to exercise "actual physical control" over a motor vehicle. People v. Swain, 959 P.2d 426, 429, 431 (1998)(so holding in context of a DUI case where defendant's keys were in the ignition and the truck's radio was playing, but defendant was asleep or passed out in the front seat); Brewer v. Motor Vehicle Div., Dep't of Revenue, 720 P.2d 564, 566-67 (Colo.1986)(holding under the express consent statute that driving means being "in actual physical control" of a motor vehicle and is not limited to "placing and controlling a vehicle in motion"). The term "operate" is somewhat broader, connoting the action of causing something "to occur ... [or] to cause to function usually by direct personal effort." People v. Gregor, 26 P.3d 530, 532 (Colo.Ct.App.2000)(quoting Webster's Third New International Dictionary 1580-81 (1986)).
 An elemental comparison thus illustrates that the two statutes, by their terms, target different conduct. To achieve a conviction under the vehicular assault statute, the prosecution must demonstrate that the defendant drove or operated a motor vehicle. See Britto v. People, 178 Colo. 216, 218-19, 497 P.2d 325 (1972) (holding that where defendant was in the back seat and a third party was driving, the defendant could not be convicted of vehicular assault for causing the victim to be dragged by the car but noting that such conduct could sustain a conviction for other offenses if the defendant had been properly charged). Accordingly, one who causes serious bodily injury by dint of a motor vehicle that is used as a weapon, but that is not driven or operated, could be convicted of reckless second degree assault with a deadly weapon but not vehicular assault. For example, if an adult locks a child in a car on a sweltering summer day to punish or intimidate the child, the adult obviously is not driving or operating the car. Assuming that the other elements of the crime are met, however, the adult could be charged with reckless second degree assault but not vehicular assault.
 The second difference between the statutes relates to causation. The second degree assault statute applies to one who recklessly "causes" serious bodily injury. Vehicular assault, by contrast, applies where reckless driving is the "proximate cause" of serious bodily injury. Colorado's jury instructions provide that "`cause' means that act or failure to act which in natural and probable sequence produced the claimed injury." CJI Criminal 9:10, 9(4) (1983). Proximate cause, by contrast, "means a cause which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have been sustained." CJI Criminal, 9:10, 9(3) (1983). The plain language of the statutes thus illuminates a significant difference between the laws: second degree reckless assault can apply to acts of omission; vehicular assault cannot.
 A variation on the facts of People v. Clary, 950 P.2d 654 (Colo.Ct.App.1997), illustrates how one could be convicted of second degree reckless assault for an act of omission. In Clary, the defendant was an automobile mechanic who worked on the brakes of his own vehicle at the shop where he was employed shortly before he was involved in an accident. Id. at 656. At that time, the defendant's truck was leaking fluids and the brake pedal, when tested, had no pressure. Id. Rather than install new brake pads, the defendant rigged a bungee cord to the brake pedal. Despite being warned by a coworker that such a makeshift system was unsafe, the defendant proceeded to drive the vehicle home; shortly thereafter, he was involved in a two-automobile accident that caused serious bodily injury and death to the occupants of the other vehicle. Id. at 655-56.
 In the real case, Clary, the auto mechanic and owner of the defective vehicle he deliberately failed to repair, was also the driver in the accident. If the facts were the same but Clary were not the driver, he could be liable for reckless assault but not vehicular assault. Suppose that Clary lent the truck to a friend without fixing the brakes or warning the friend that the brakes were faulty. A subsequent injury accident while the friend drove the truck would expose Clary to criminal liability for second degree reckless assault, among other crimes, because of his omissions.
 The decision by the General Assembly to punish both affirmative acts and acts of omission under the second degree assault statute, while penalizing only affirmative acts under the vehicular assault statute, is a rational choice among many public policy alternatives. Cf. Rostad, 669 P.2d at 128 (making this point in concluding that the legislature's decision to require proof of proximate cause in criminal proceedings related to the operation of motor vehicles is a reasonable public policy choice).
 The third primary difference between second degree assault and vehicular assault lies in the means by which the defendant allegedly caused serious bodily injury. The vehicular assault statute provides that, to be convicted, the defendant's reckless driving or operation of a "motor vehicle" must have proximately caused serious bodily injury. The second degree assault statute requires that the defendant use a "deadly weapon." In order for us to conclude that the two statutes proscribe identical conduct, then, we would have to conclude that a motor vehicle is always a deadly weapon. As we explain below, we decline to adopt a construction of "deadly weapon" that contravenes our case law and that defies common sense and common experience.
 Section 18-1-901(3)(e), 6 C.R.S. (2001), provides the statutory definition of deadly weapon:
"Deadly weapon" means any of the following which in the manner it is used or intended to be used is capable of producing death or serious bodily injury:
(I) A firearm, whether loaded or unloaded;
(II) A knife;
(III) A bludgeon; or
(IV) Any other weapon, device, instrument, material, or substance, whether animate or inanimate.
 Relevant here is subsection (IV), which applies to items or objects that are not ordinarily thought to be deadly weapons but may become deadly weapons, depending on how they are used. People v. Saleh, 45 P.3d 1272 (Colo.2002) (construing subsection (IV) and holding that when a foot is used as a weapon that causes serious bodily injury, it satisfies the statutory definition of "deadly weapon").
 We have consistently held that whether an object is a deadly weapon for the purposes of section 18-1-903(e)(IV) depends on the manner in which the object is used. Saleh, 45 P.3d at 1275-75; People v. Ross, 831 P.2d 1310, 1312 (Colo.1992)(holding that a fist can be a deadly weapon); Bowers v. People, 617 P.2d 560, 562-63 (Colo.1980)(holding that a whiskey bottle may be a deadly weapon depending on how it is used); People v. Bramlett, 194 Colo. 205, 209, 573 P.2d 94, 96 (1977) (stating that any object used in a manner capable of producing death or serious bodily injury is a deadly weapon).
 In People v. Saleh, we recently reaffirmed that "[a]ny object can be a deadly weapon if it is used in a manner capable of producing death or serious bodily injury." 45 P.3d at 1275. There, we rejected the court of appeals' reasoning that section 18-1-901(3)(e)(IV) refers to instruments that "can be used in a manner consistent with their design to inflict serious bodily injury." Id. Instead, we concluded that 18-1-901(3)(e)(IV) "limits the scope of `deadly weapon' by including only those objects which `in the manner [they are] used or intended to be used [are] capable of producing death or serious bodily injury'." Id. Thus, we held "that when an object is used in a manner capable of causing death or serious bodily injury, the object used is a deadly weapon within the statutory definition of section 18-1-901(3)(e)." Id. at 1276.
 Saleh underscores the point that implicit in our deadly weapon analysis of subpart (IV) is the requirement that the object be used or intended to be used as a weapon. Our holding there, and in the prior caselaw, thus contemplates a two-step inquiry in determining whether an instrument is a deadly weapon. First, the object must be used or intended to be used as a weapon. Grass v. People, 172 Colo. 223, 228, 471 P.2d 602, 604 (1970) (adopting the view that the instruments that are not per se deadly weapons "must . . . mean some article or object, which could be and was used as a weapon"). Second, the object must be capable of causing serious bodily injury. Thus, in Saleh, the defendant's foot would not have been deemed a deadly weapon had the defendant not used it as a weapon. Obviously, in the normal course of events, people are not walking on deadly weapons. That the defendant's foot was capable of producing serious bodily injury would be irrelevant for purposes of section 18-1-901(3)(e) had the foot not been deployed as a weapon. The defendant need not intend to cause serious bodily injury; he must merely use as a weapon an object or instrument that is capable of causing such injury.
 The same is true of a motor vehicle. It is not always a deadly weapon under the statutory definition. A motor vehicle may be a deadly weapon, however, depending on how it is used in a particular situation.
 The difference between the "deadly weapon" requirement of the second degree assault statute and the "motor vehicle" element of vehicular assault justifies the disparate penalties established by the General Assembly. The legislature could rationally decide that "road rage" or the use of a car as a deadly weapon justifies an increased penalty. At the same time, it could rationally determine that it is less reprehensible for one to cause serious bodily injury by mere reckless driving of a vehicle as a vehicle. This court cannot hold that the General Assembly has constitutionally erred in providing a more severe penalty for an act which it believes to be of greater social consequence. People v. Czajkowski, 193 Colo. 352, 356, 568 P.2d 23, 25-26 (1977). Accordingly, we conclude that the difference between "motor vehicle" and "deadly weapon" is both real in fact and also reasonably related to the legislature's purpose of punishing those who use weapons to cause injury. Stewart's right to equal protection under the law was not violated.
 2. Offenses Charged
 Stewart argues that even if the statutes are not identical, he can be convicted only of the more specific crime, motor vehicle assault, and not of the more general crime, second degree assault. Generally, the prosecution has discretion to determine what charges to file when a defendant's conduct violates more than one statute. See § 18-1-408(7), 6 C.R.S. (2001). There are certain circumstances in which this general rule does not apply. See, e.g., People v. Smith, 938 P.2d 111, 115-16 (Colo.1997); People v. Bagby, 734 P.2d 1059, 1061-62 (Colo.1987).
 Stewart has failed to show that his crimes fall into this category. He simply asserts that the General Assembly intended to punish motor vehicle offenses pursuant to the motor vehicle statutes. He cites no authority such as statutory language or legislative history to support his theory and we reject it. The prosecution had discretion to charge second degree assault in this case and the jury verdict convicting Stewart on that charge stands.
 Therefore, we reverse the judgment of the court of appeals on this issue.5
 3. Jury Instruction Error
 Stewart next argues that the trial court committed reversible error by failing sua sponte to instruct the jury that "intervening cause" constituted an affirmative defense to first and second degree assault. The court of appeals agreed, concluding that this failure constituted plain error and thus required the reversal of Stewart's conviction. We reverse.
 In this case, Stewart's counsel submitted to the court a package of instructions that were given to the jury as requested by Stewart. Defense counsel affirmatively stated that he had no objections to the instructions when the trial court so inquired. Included among these instructions were two theory-of-the-case instructions, the second of which explained that "intervening cause" was an affirmative defense6 to the crimes of vehicular assault and careless driving resulting in injury. Stewart's counsel did not request a similar instruction on the first or second degree assault charges, and the trial court did not provide one. The first theory of the case instruction, however, stated that Stewart acted in self defense, and that self defense is an affirmative defense to first and second degree assault.
 During deliberations, the jury sent out a question, signed by the foreperson, which inquired in relation to the vehicular assault charge:
If both parties (Ehrmann & Stewart) are culpable to some degree is a conviction warranted?
 The trial court replied:
Richard Ehrmann's culpability must be an act of gross negligence which was not reasonably foreseeable by the Defendant. Consider this answer in relationship to [the instruction on the defendant's theory of the case as to vehicular assault or careless driving resulting in injury].
 As noted above, the jury acquitted Stewart of vehicular assault and careless driving resulting in injury, and it convicted him of second degree assault and two counts of reckless endangerment. The verdict as to second degree assault, Stewart contends, was erroneous, and the error is attributable to the court's failure to instruct on intervening cause for the first and second degree assault charges. In Stewart's view, the error engendered jury confusion over, and misunderstanding of, causation. Had it correctly understood and applied the relevant law, he maintains, the jury would have acquitted Stewart of second degree assault as well as vehicular assault.
 The People contend that we need not address the merits of this claim because any failure to instruct on intervening cause was invited error caused by Stewart. We agree with Stewart and the court of appeals that a nontactical instructional omission generally should be reviewed for plain error.
 We acknowledge, however, that on occasion we have declined to review errors, including jury instruction errors, alleged by a party who is responsible for the claimed error under the invited error doctrine. Horton v. Suthers, 43 P.3d 611, 618-19 (Colo.2002); People v. Zapata, 779 P.2d 1307, 1309 (Colo.1989)(deciding not to address merits of plain error argument raised by criminal defendant where defendant's counsel prepared and tendered theory of the case instruction about which defendant later complained). However, in Zapata we recognized that some courts have found an exception to the invited error doctrine where the error was not a part of the defendant's trial strategy. 779 P.2d at 1310 n. 4. Because that was not the case in Zapata, however, we declined to consider whether such an exception exists in Colorado law.
 The instant case, by contrast, likely presents a case of oversight, not strategy. Although defense counsel tendered an affirmative defense instruction of self defense as to first and second degree assault and the intervening cause instruction as to vehicular assault, thereby providing affirmative defense instructions for each of the major charges, we view the omission of the intervening cause instruction as to first and second degree assault as an oversight in light of the heavy reliance Stewart placed on this theory during trial. Throughout, he maintained that Ehrmann abruptly leapt upon the vehicle, although he also argued that he acted in self defense and that the incident was an accident. While it is possible that Stewart elected to emphasize the theory of self defense for strategic reasons, and concomitantly wished to deemphasize intervening cause as an affirmative defense to first and second degree assault, we assume without deciding that the omission was an oversight.
 In light of the likely nontactical basis of the omission, we find Chief Justice Quinn's special concurrence in Zapata particularly persuasive. There, he stated that if "claimed error is truly `plain,' in that it so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the result, it would seem ... that an appellate court, rather than refusing to address the issue by a wooden application of the invited error rule, should come to grips with the defendant's claim in order to prevent a possible miscarriage of justice." 779 P.2d at 1311 (Quinn, C.J., specially concurring). He recognized that the although invited error in most cases will result from defense counsel's inadvertence or negligence, it is the defendant who must bear the stigma of a conviction and the burden of prison time; accordingly, application of the plain error doctrine, rather than the invited error doctrine, "does no more than provide an appellate court with the necessary means to reverse a criminal conviction obtained in derogation of fundamental fairness." Id. Additionally, although such errors likely will be considered in postconviction proceedings under Crim. P. 35(c), an appellate court's willingness to consider them on direct appeal would "obviate any additional injustice" resulting from what may later be deemed an invalid conviction. Id. at n. 2.
 We agree. Where it appears that an error or omission in jury instructions is due to inadvertence or attorney incompetence, the reviewing court should apply the doctrine of plain error. Where, however, the omission is strategic, the invited error doctrine should be invoked. Thus, "`wherer a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.'" People v. Garcia, 826 P.2d 1259, 1263 (Colo. 1992) (quoting Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)).
 In this case, as noted above, it appears that the alleged error was the result of inadvertence. Accordingly, we review the instructional omission for plain error. Finding none here, we reverse the court of appeals' decision on this issue.
 It is axiomatic that a trial court is obligated to instruct the jury correctly on the law applicable to the case. People v. Cowden, 735 P.2d 199 (Colo.1987); see also Hansen, 957 P.2d at 1384. A defendant also is entitled to a theory of the case instruction if the record contains any evidence, even highly improbable testimony by the defendant, to support the theory. People v. Nunez, 841 P.2d 261, 264-65 (Colo.1992); People v. Fuller, 781 P.2d 647, 651 (Colo.1989).
 While the court is duty-bound to instruct the jury, "it is equally the duty of counsel to assist the court by objection to erroneous instructions, and by the tender of instructions covering matters omitted by the court." Fresquez v. People, 178 Colo. 220, 231, 497 P.2d 1246, 1252 (1972) (internal citation omitted); Ellis v. People, 114 Colo. 334, 164 P.2d 733 (1945). A defendant must make all objections she has to instructions prior to their submission to the jury. See Crim. P. 30. The purpose of this rule is to enable the trial judge to prevent error from occurring and to correct an error if improper instructions are tendered. People v. Barker, 180 Colo. 28, 32, 501 P.2d 1041, 1043 (1972). Where counsel fails to object or to tender instructions on the omitted issues, appellate courts will not consider any error assigned to the giving, or failure to give, pertinent instructions unless there was plain error. Crim. P. 30; Crim. P. 52; see also People v. Tilley, 184 Colo. 424, 427, 520 P.2d 1046, 1047 (1974)(collecting cases).
 Plain error analysis applies here because Stewart failed to comply with our rules of criminal procedure. Here, as noted above, Stewart's counsel, with the assistance of special co-counsel brought in to help craft the appropriate instructions, drafted a set of instructions, which the trial court delivered as requested. Stewart affirmed that he had no objection to the instructions when asked by the court; he did not object to the omissions as Criminal Procedure Rule 30 requires. Thus, under the legal principles outlined above, we review the alleged error under the plain error rubric.
 Plain error is grave error that seriously affects the substantial rights of the accused. Espinoza v. People, 712 P.2d 476, 478 (Colo.1985). It is an error that is "both obvious and substantial." Barker, 180 Colo. at 32, 501 P.2d at 1043. In the context of jury instructions, we have refused to find plain error unless a review of the entire record demonstrates a "reasonable possibility that the improper instruction contributed to the defendant's conviction." People v. Dillon, 655 P.2d 841, 845 (Colo.1982). It is unlikely that an erroneous instruction will be considered plain error if the evidence of the defendant's guilt is overwhelming. Espinoza, 712 P.2d at 478; cf. Barker, 180 Colo. at 33, 501 P.2d at 1043.
 In this case, Stewart maintains that the verdict would have been different had the affirmative defense instruction been given. As evidence of this belief, he points to the jury's question to the trial court referencing the vehicular assault instruction and inquiring what they should do if both parties were culpable to some degree. As noted above, the instruction to which the court referred them — defendant's theory of the case as to vehicular assault — included the affirmative defense of intervening cause as to that charge only. The jury's subsequent acquittal of Stewart on the vehicular assault charge but its conviction of him on the second degree assault charge, he maintains, is attributable to the omission of the affirmative defense of intervening cause as to second degree assault.
 We disagree. A defendant is responsible for serious bodily injury to another if the injury is a natural and probable consequence of his misconduct. People v. Gentry, 738 P.2d 1188, 1190 (Colo.1987); Hamrick v. People, 624 P.2d 1320, 1323-24 (Colo.1981). Unlawful conduct that is broken by an independent intervening cause cannot be the proximate cause of injury to another. Gentry, 738 P.2d at 1190; Calvaresi, 188 Colo. at 283,534 P.2d at 319. An independent intervening cause "is an act of an independent person or entity that destroys the causal connection between the defendant's act and the victim's injury and, thereby becomes the cause of the victim's injury." People v. Saavedra-Rodriguez, 971 P.2d 223, 225-226 (Colo.1998). To qualify as an intervening cause, an event must be unforeseeable and one in which the accused does not participate. Gentry, 738 P.2d at 1190. In Calvaresi, we held that simple negligence is foreseeable, and thus may not constitute an independent intervening cause. 188 Colo. at 283,534 P.2d at 319. Gross negligence, however, is unforeseeable behavior that may serve as an intervening cause. Id.
 In this case, an intervening cause instruction as to second degree assault would have been incorrect because the facts of the case do not implicate an intervening cause. Cf. Hamrick, 624 P.2d at 1333-34. Even if the jury believed that Ehrmann had, without warning, jumped on the front quarter panel of Stewart's vehicle, and even if it deemed such conduct grossly negligent, Ehrmann's act would not constitute a "break" in the causal chain launched by Stewart's misconduct. At the time of the supposed jump, Stewart arguably had not committed a criminal act with respect to Ehrmann.7 In fact, according to Stewart's own version of the events, he had not acted unlawfully before Ehrmann jumped. Stewart's criminal act occurred after the alleged jump, when Ehrmann fell to the ground, and when Stewart failed to verify Ehrmann's location, disregarding the risk that Ehrmann had fallen beneath his vehicle's wheels. The act of driving forward, and running over Ehrmann's head, was the actus reus for which Stewart was convicted. It was undisputed at trial that Stewart ran over Ehrmann's head and that this act caused Ehrmann's injuries. Ehrmann's prior act of jumping on the car did not cause Stewart's subsequent act of driving over Ehrmann's head.8 Stewart drove forward of his own volition.
 Moreover, for an independent intervening cause to relieve the defendant of liability, he must not have been a participant in the event. Saavedra-Rodriguez, 971 P.2d at 226; Calvaresi, 188 Colo. at 283, 534 P.2d at 319. In this case, Ehrmann's alleged leap came after Ehrmann brushed against Stewart's car and after their ensuing verbal altercation. Thus, this is not a case in which the defendant fairly can be characterized as a non-participant. Accordingly, by its very definition, independent intervening cause could not have been implicated in this case, no matter how favorably to Stewart we construe the evidence. An intervening cause instruction should not have been given, even as to vehicular assault. Thus, any instructional error actually benefited Stewart; had the intervening cause instruction not been given as to vehicular assault, it is possible that he would have been convicted of that charge as well.
 We conclude that the trial court's failure to give an instruction on intervening cause with respect to reckless assault was not error, much less plain error. Because independent intervening cause by definition could not apply to the circumstances of this case, even assuming Stewart's version of the facts is correct, no substantial rights of the defendant were impacted by the omission of the intervening cause instruction as to second degree assault. As a consequence, we reverse the court of appeals on this issue.
 4. Investigating Officer Testimony
 Next, we consider whether the court of appeals erred in holding that the trial court abused its discretion in allowing a police officer to testify about his accident reconstruction without being qualified as an expert. The trial court found that the officer was testifying as a perceiving witness, not as an expert.
 At trial, the prosecution called the investigating officer, who testified about his investigation of the crime scene. Although the prosecution did not seek to qualify the officer as an expert, the officer attested that he had received 240 hours of instruction in investigating traffic accidents, including eighty hours of "intense technique in accident investigation" and eighty hours in accident reconstruction. Defense counsel expressed concern that the officer would be used as an expert in accident reconstruction, despite the fact that none of the disclosures or procedural requirements for putting on an expert had been satisfied. Defense counsel then asked for an offer of proof as to the officer's testimony. The prosecution proffered that the officer would describe "what he did in the accident investigation." On the basis of the prosecutor's representation, the court overruled defendant's objection, concluding that the officer would not be testifying as an expert witness.
 The officer's testimony centered on his investigation of the incident. Noting, however, that he had received extensive instruction in investigating traffic accidents, the officer testified that he performed a "reconstruction of the incident." Based on a witness's account of what transpired, the officer staged a reconstruction at the scene of the crime and used Stewart's vehicle. As a result of this reconstruction, the officer stated, he concluded that some skidmarks found at the scene were traceable to Stewart's vehicle and evidenced acceleration of the vehicle in reverse. A "squiggle mark" on the pavement, he opined, corresponded to where the right rear wheel rose and marked the curb sidewall when the left rear wheel ran over Ehrmann's head on the night of the incident. The officer was able to recreate the "squiggle mark," he testified, by driving over a cement block with the vehicle. The officer attested that he was able to determine the vehicle's position at various points during the incident, and that he knew the vehicle's direction and relative speed as it struck Ehrmann's head. The officer then offered his opinion on how the incident occurred. Defense counsel lodged timely objections.
 The court of appeals concluded that the trial court abused its discretion in permitting the officer to express expert-type opinions without qualifying him as an expert witness. Acknowledging that his testimony was not necessarily beyond the ken of an officer well trained in accident investigation or reconstruction, the court of appeals nevertheless objected that "the investigating officer should not have been permitted to express his opinions, even though not so denominated, as to how the incident occurred without first being qualified as an expert witness." On retrial, it directed, the officer must be qualified as an expert before being permitted to give any opinion testimony based on specialized knowledge or training.
 A trial court's rulings on evidentiary issues are reviewed for an abuse of discretion. A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair. People v. Ibarra, 849 P.2d 33, 38 (Colo.1993).
 In this case, whether the court abused its discretion turns on whether the officer's testimony was improper under Rule 701 of the Colorado Rules of Evidence. That rule, which governs the admission of opinion testimony by a lay witness, but not Rule 702, which addresses expert witness testimony, applies since the prosecution did not seek to qualify the officer as an expert witness. Colorado Rule of Evidence 701 provides that:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.
 Colo. R. Evid. 701. Thus, consistent with Rule 602,9 the opinion must be rationally based on the witness's first-hand perceptions, and the opinion must also facilitate an understanding of the witness's testimony. See Arthur Best et al., Colorado Evidence: 2002 Courtroom Manual 187 (2002). Colorado's Rule 701 is substantively identical to that of its federal counterpart.10 Accordingly, we look to federal cases construing the rule for guidance in our own efforts to interpret its meaning and scope.
 The application of Rule 701 to police officer testimony has generated equal measures of confusion and controversy, see Mark Hansen, "Dr. Cop On the Stand," ABA Journal 31 (May 2002). Law enforcement officers are often qualified as experts to reconstruct crime scenes and offer opinions as to how accidents occurred. Additionally, police officers regularly, and appropriately, offer testimony under Rule 701 based on their perceptions and experiences. Cf. United States v. Novaton, 271 F.3d 968, 1008 (11th Cir.2001)(emphasizing that a witness does not fall outside of Rule 701 simply because his or her "rational[] . . . perception" is based in part on the witness's past experiences)(quoting United States v. Myers, 972 F.2d 1566, 1577 (11th Cir.1992)).
 Officer testimony becomes objectionable when what is essentially expert testimony is improperly admitted under the guise of lay opinions. United States v. Peoples, 250 F.3d 630, 641 (8th Cir.2001); United States v. Figueroa-Lopez, 125 F.3d 1241, 1244-46 (9th Cir.1997). As the Peoples court observed, "[s]uch a substitution subverts the disclosure and discovery requirements of Federal Rules of Criminal Procedure 26 and 16 and the reliability requirements for expert testimony." 250 F.3d at 641; see also Figueroa-Lopez, 125 F.3d at 1246 (making the same point); Gregory P. Joseph, "Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure", 164 F.R.D. 97, 108 (1996) (urging courts to be "vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process").
 For these reasons, most federal courts that have considered a variant of the officer-testimony issue we confront today have required that, when an officer's opinions require the application of, or reliance on, specialized skills or training, the officer must be qualified as an expert before offering such testimony.
 For example, the Eleventh Circuit recently considered whether a detective who deciphered drug "hieroglyphics" in a telephone directory improperly offered expert testimony in describing how he had decoded the information. United States v. Cano, 289 F.3d 1354 (11th Cir.2002). Concluding that the deciphering did not constitute expert testimony, the court acknowledged that some other courts considered the interpretation of drug ledgers to be expert testimony. It distinguished those cases, however, as turning on the detective's use of "previously acquired experience or specialized knowledge to interpret the ledger's notations." Id. at 1361. In the case at bar, by contrast, the court noted that the officer did not use his experience as a narcotics detective to translate the code; instead, the officer "did precisely what the prosecutor invited the jury to do in closing argument; the jurors were asked to perform the same exercise [the officer] had carried out in their presence and break the code themselves." Id. at 1362.
 In United States v. Figueroa-Lopez, the Ninth Circuit held that law enforcement agents offering testimony that the defendant's conduct was consistent with that of an experienced narcotics trafficker could not testify as lay witnesses. 125 F.3d 1241, 1246 (9th Cir.1997). Observing that the proffered testimony constituted precisely the type of "specialized knowledge" governed by Rule 702, the court reasoned that "holding to the contrary would encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses." Id. In that court's view, the mere perception by a witness of "the facts on which he wishes to tender an opinion does not trump Rule 702. Otherwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death." Id.
 Applying similar reasoning, but reaching a different result, in Peoples, the Eighth Circuit held that the district court erred in admitting the testimony of an agent where she "lacked first-hand knowledge of the matters about which she testified" and based her opinions on "her investigation after the fact, not on her perception of the facts." 250 F.3d at 641-42.
 We agree with the reasoning of the Eighth, Ninth, and Eleventh Circuits. Accordingly, we hold that where, as here, an officer's testimony is based not only on her perceptions and observations of the crime scene, but also on her specialized training or education, she must be properly qualified as an expert before offering testimony that amounts to expert testimony.
 Consequently, we determine that, in this case, the trial court abused its discretion in admitting the officer's testimony about the accident reconstruction and the inferences he drew therefrom without requiring that he be qualified as an expert. While his testimony about his observations of the crime scene and his investigation of the incident were proper, it was inappropriate for the court to permit him to testify as a lay person about his reconstruction of the crime scene and his deductions about such matters as the vehicle's direction, position, and speed.
 Having determined that the trial court abused its discretion in admitting the officer's expert testimony under the guise of lay opinion, we consider whether the error was harmless. A ruling admitting or excluding evidence is not reversible unless the ruling affects a substantial right of the party against whom the ruling is made. Colo. R. Evid. 103(a); see also C.A.R. 35(e) (stating that the appellate court shall disregard any error not affecting a substantial right of party); Crim. P. 52 (any error not affecting substantial rights shall be disregarded). "If a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless." People v. Gaffney, 769 P.2d 1081, 1088 (Colo. 1989); see also King v. People, 785 P.2d 596, 604-05 (Colo.1990); Tevlin v. People, 715 P.2d 338, 341-42 (Colo.1986).
 A review of the record reveals that inclusion of the officer's testimony did not have a substantial influence on the verdict or impair the fairness of the trial. The officer's testimony that "some skidmarks denoted acceleration of the vehicle in reverse" was corroborated by Stewart himself, who testified that he backed up during the incident. Additionally, eyewitness testimony substantiated the officer's conclusions about the speed and angle of the vehicle. In view of defense counsel's request that a second reenactment, captured on videotape and featuring witness Castro, be admitted, the officer's brief testimony about his reenactment of the incident was harmless. Finally, the officer's testimony that he was able to duplicate the "squiggle mark" on the pavement through experimentation with a cement block cannot be said to have substantially affected the verdict since it was undisputed, and the evidence overwhelmingly showed, that the defendant drove his vehicle over the victim's head. Thus, we determine that admission of the officer's testimony did not affect any of Stewart's substantial rights.
 Similarly, the prosecution's two references in closing arguments to the officer's testimony were harmless. In the first instance, the prosecutor stated that Stewart was not credible in testifying that he did not feel the bump or notice the wheels of his vehicle lift as he ran over Ehrmann's head. Alluding to the officer's testimony concerning the reconstruction, she said: "In order to recreate the squiggle, they drove it over a rock, and it was up on its side wall to make that mark." As noted above, it was not in dispute that Stewart's vehicle ran over Ehrmann's head. Thus, it cannot be said that the prosecutor's above-referenced remarks in closing impaired the trial's fairness or influenced the verdict.
 The second reference to the officer's testimony centered on the parties' divergent theories concerning which part of Ehrmann's body — his buttocks or elbow — caused a dent in the vehicle's hood. The prosecutor sought to discredit Stewart's hired expert, criticizing him for conducting a deficient investigation because he failed to "look under the quarter panel to see if it had reinforcement." The officer, by contrast, "looked and there was reinforcement." The prosecutor went on to note that Stewart's expert failed to "test or try to replicate the force to try to substantiate [his theory]." The unstated implication here was that the officer did conduct an experiment to replicate the force necessary to cause the dent.
 These references to the officer's testimony were harmless. The first remark, that Officer Slavksy observed reinforcement on the quarter panel but not under the vehicle's hood, referred to his investigation of the crime, not his reconstruction of the incident. Like any other lay witness, he testified about what he saw or perceived; this testimony neither required nor involved specialized knowledge. Moreover, the jury itself was permitted to inspect the vehicle and examine the strength and thickness of the quarter panel and hood. The jury could have inferred from the prosecutor's second remark, involving criticism of Stewart's expert for his failure to conduct tests on the quarter panel and hood, that she was tacitly referring to, and commending, the officer's reconstruction of the incident. However, the mere possibility that they drew this inference from her remarks is insufficient to constitute reversible error. We can say with fair assurance that this unspoken reference to the officer's reconstruction testimony did not influence the jury's verdict or render the trial unfair.
 Accordingly, we conclude that the trial court's error in admitting the officer's testimony was harmless.
 5. Appeal Bond
 Finally, we consider whether the court of appeals erred in concluding that the trial court did have jurisdiction to grant an appeal bond without a remand from the court of appeals. In this case, the court of appeals issued its original opinion in November 1999, after which the trial judge released Stewart on an appeal bond. The prosecution filed a petition for rehearing, which the court of appeals granted; the court's original opinion was withdrawn. The prosecution then filed an emergency appeal with the court of appeals, asserting that the trial court lacked jurisdiction to grant an appeal bond. The court of appeals held that a district court need not wait for a limited remand in order to consider a defendant's request for an appeal bond.11
 In reaching its conclusion, the court of appeals relied on our opinion in People v. Dillon, 655 P.2d 841 (Colo.1982). In Dillon, we stated that "once an appeal has been perfected, the trial court has no jurisdiction to issue further orders in the case relative to the order or judgment appealed from" unless a statute or rule provided an exception. Id. at 844. The court of appeals reasoned that, by implication, our holding in Dillon meant that a trial court retains jurisdiction over matters that are not relative to, or do not affect, the order or judgment on appeal.
 The court of appeals' judgment below was consistent with an opinion by a division of that court in People v. Widhalm, 991 P.2d 291 (Colo.Ct.App.1999), holding that a trial court retained jurisdiction to revoke probation where a direct appeal was pending. However, the decision conflicted with an opinion issued by a different division of the court of appeals in People v. Kyu Ho Yi, 741 P.2d 1264, 1265 (Colo.Ct.App.1987). In Kyu Ho Yi, the court of appeals determined that a remand to the trial court is necessary before an appeal bond can be granted. In light of this split of authority, we granted certiorari.
 Section 16-4-201, 6 C.R.S. (1999), authorizes an appeal bond, except in capital cases. The statute contemplates that, at least initially, a request for an appeal bond will be made in the trial court; C.A.R. 9(b) contains a similar provision. Thus, as the court of appeals noted in this case, "[i]t is apparent from both the rule and statute that a motion for an appeal bond may be filed and acted upon prior to the commencement of the appeal." An ambiguity arises, it observed, as to the effect that filing an appeal bond has on the status of a trial court's jurisdiction over appeal bonds.
 We agree with the court of appeals' analysis and disposition of the issue. A trial court retains jurisdiction to act on matters that are not relative to and do not affect the judgment on appeal. Dillon, 655 P.2d at 844; Molitor v. Anderson, 795 P.2d 266 (Colo. 1990). Accordingly, we hold that no limited remand was necessary for the trial court to consider Stewart's application for an appeal bond after he filed a direct appeal. Therefore, we affirm the court of appeals' judgment with respect to this issue.
 III. Conclusion
 In sum, we hold that the second degree reckless assault statute and the vehicular assault statute proscribe different conduct. Therefore, we conclude that they do not violate Stewart's right to equal protection under the law. We also conclude that the trial court did not commit plain error in failing to instruct the jury that "intervening cause" constituted an affirmative defense to second degree reckless assault. Additionally, we determine that the trial court abused its discretion in permitting an investigating officer to testify as an expert witness without complying with the strictures of Colo. R. Evid. 702; however, we conclude that the error was harmless. Finally, we hold that a limited remand to the trial court was not necessary for that court to consider the defendant's request for an appeal bond. Accordingly, we reverse the court of appeals' judgment in part and affirm it in part.
 1. On the first day of trial, the prosecution moved to dismiss the four counts of violent crime and the court granted the request.
 2. Because the court of appeals concluded that a reversal of Stewart's conviction was necessary due to the instructional error, it did not address whether it viewed this error as reversible. Instead, it addressed the issue to provide guidance to the trial court upon retrial.
 3. § 18-3-203(2)(c), 6 C.R.S. (2001); § 16-11-309, 6 C.R.S. (2001); see also § 18-1-105 (9.7)(a) and (b)(XIII), 6 C.R.S. (2001).
 4. Because the Equal Protection Clause of the United States Constitution has not been construed to extend to statutory schemes that assign different punishments to indistinguishable conduct, we limit our analysis of Stewart's equal protection claim to the standards under the Colorado Constitution. People v. Madril, 746 P.2d 1329, 1332 n. 3 (Colo.1987); People v. Marcy, 628 P.2d 69, 74 (Colo.1981).
 5. Because we reverse the court of appeals on this issue, we do not reach the question of whether the remedy it selected — requiring that Stewart be retried for second degree assault but permitting a punishment only of vehicular assault if he were to be convicted — is appropriate.
 6. In People v. Saavedra-Rodriguez, 971 P.2d 223 (Colo.1998), we held that an intervening cause defense is properly treated as an affirmative defense.
 7. However, the jury determined that Stewart had recklessly endangered the lives of Christine Castro and Jeffrey Pippenger, presumably at the time he allegedly drove his vehicle back and forth in an aggressive manner.
 8. In finding Stewart guilty of second degree reckless assault, the jury concluded that Stewart's acts were not performed upon a sudden heat of passion or caused by a highly provoking act of Ehrmann.
 9. Colorado Rule of Evidence 602 provides that a witness may not testify as to matters of which she has no personal knowledge. The rule is subject to Rule 703, which permits expert witnesses to offer opinions on matters about which they do not possess personal knowledge.
 10. Fed.R.Evid. 701 was amended in 2000, adding a clause to the end of the rule to eliminate confusion between rules 701 and 702 and to clarify the distinction between lay and expert testimony. See Fed.R.Evid. 701(c) (adding the requirement that opinion testimony by lay witnesses be limited to opinions "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). Federal courts have observed that this addition does not substantively change Rule 701; instead, courts have noted, the amendment is designed to clarify the status quo ante. United States v. Garcia, 291 F.3d 127, 140 n. 8 (2d Cir.2002). "Indeed, the amendment serves more to prohibit the inappropriate admission of expert opinion under Rule 701 than to change the substantive requirements of the admissibility of lay opinion." Id. Thus, as the advisory committee noted, "Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R.Evid. 701 advisory committee notes (2000). That is, the amendment contemplates precisely the situation we confront in this case, and it evidences a clear intent to clarify that 701 has required and continues to require that expert testimony be offered by those who are qualified according to the procedural rules governing experts. "By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson." Id.
 Colorado has not amended its Rule 701 to reflect this addition and the amended federal Rule was not in effect at the time of trial in this case. The amendment and the advisory committee's notes are not binding on this court although they are relevant as tools for discerning the meaning of the version of Rule 701 with which we are concerned.
 11. In spite of this determination, the court concluded on other grounds not relevant here that Stewart was ineligible for an appeal bond.