22CA1850 Peo v Brown 11-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1850
Adams County District Court No. 20CR2376
Honorable Caryn A. Datz, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sareya Nique Brown,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Dilyn K. Myers, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Sareya Nique Brown, appeals the judgment of conviction entered on a jury verdict finding her guilty of several offenses arising from a car accident, including criminally negligent homicide, reckless driving, and careless driving.  Brown contends that the district court made multiple evidentiary errors and that the cumulative effect of those errors requires reversal.  We affirm.

## I.     Background

¶ 2     In June 2020, Brown found out that the victim was having an affair with her husband, so she drove her black Suburban to the victim's neighborhood.  Brown saw the victim come out of her house and get into a gold sedan.  Through her open passenger side window, Brown asked the victim if they could talk.  The victim did not respond and instead drove away.  Brown followed the victim.

¶ 3     Still in the victim's neighborhood, Brown pulled into the left lane on a two-lane road, driving against the direction of traffic and beside the victim's car, and "loudly" asked the victim to pull over to talk.  Again, the victim did not react.  Brown later admitted that she understood at that time that the victim did not want to talk.

¶ 4     Although Brown testified that she and the victim were both driving normally and that they came to a complete stop before

1

turning out of the victim's neighborhood onto Peoria Street, a witness testified that the cars sped past him, that it looked like the black Suburban was chasing the gold sedan, and that the Suburban cut off the sedan at a light at Peoria Street. While she was driving, the victim called 911 and told dispatch that Brown was chasing her because Brown thought she was having an affair with Brown's husband.

¶ 5        Brown testified that as the cars approached a bridge on Peoria Street, Brown was driving in the left lane, and the victim was driving in the center lane. On the bridge, the victim tried to merge in front of Brown to avoid a car ahead of her in the center lane, but the victim clipped the front of Brown's car. The victim's car crossed into and collided with oncoming traffic; the victim died instantly. Brown continued driving and left the scene.

¶ 6        The prosecution charged Brown with vehicular homicide (reckless driving) and leaving the scene of an accident involving death. The district court held a four-day jury trial. The jury acquitted Brown of vehicular homicide but found her guilty of the lesser nonincluded offenses of criminally negligent homicide, reckless driving, and careless driving, and of leaving the scene of an

accident involving death. The court sentenced Brown to a controlling term of seven years in the custody of the Department of Corrections for leaving the scene and ordered the sentences on the other counts to be served concurrently.

## II. Evidentiary Challenges

¶ 7 Brown contends that the district court erred by (1) precluding her from introducing evidence that the victim had marijuana in her system when she died; (2) allowing an expert to speculate and usurp the role of the jury; and (3) admitting irrelevant and prejudicial text messages. We address and reject each contention.

## A. Standard of Review

¶ 8 We review a trial court's evidentiary rulings for an abuse of discretion. *Zapata v. People*, 2018 CO 82, ¶ 25. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16, *aff'd*, 2023 CO 22.

¶ 9 We review preserved evidentiary claims for harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12. We reverse under this standard only "if the error 'substantially influenced the verdict or affected the

fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 10 We review unpreserved evidentiary claims for plain error. *Id.* at ¶ 14. Plain error is error that is obvious and substantial, such that it so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Id.* For an error to be "plain," it "must be so clear-cut, so obvious, that a trial judge should be able to avoid it without benefit of objection." *People v. Pollard*, 2013 COA 31M, ¶ 39. Generally, for an error to be obvious, it must contravene a statute or rule, a well-settled legal principle, or established Colorado case law. *Campbell v. People*, 2020 CO 49, ¶ 25.

## B. Evidence of Marijuana in the Victim's System

¶ 11 Brown contends that the district court erred by precluding evidence that the victim had marijuana in her system at the time of the accident because it was relevant to whether Brown caused the victim's death.[1] We are not persuaded.

---

[1] Because the jury acquitted Brown of vehicular homicide and her convictions for reckless and careless driving do not require that she caused the victim's death, we analyze Brown's argument only as it relates to her conviction for criminally negligent homicide.

## 1.     Additional Background

¶ 12     On the first morning of trial, the prosecutor moved to preclude evidence of the victim's failure to use a seatbelt, arguing that it was not relevant because it was not an intervening cause.  Although defense counsel responded that he was not raising an intervening cause defense, he argued that the totality of the facts were relevant to determine causation, including the fact that the victim "had about twice the legal limit of marijuana in her system at the time of the accident," "was on the phone," "was not wearing a seat belt[,] and . . . [swerved] into Ms. Brown by changing lanes without using a turn signal."  Defense counsel argued that these facts collectively demonstrated the victim's unforeseeable gross negligence.

¶ 13     In excluding the evidence, the court ruled,

> [W]hether or not [the victim] may have had marijuana in her system or was not using a seat belt are factors that would be foreseeable, and they do not amount to gross negligence that would substantiate an intervening cause that would break the chain of causation from the actions that are alleged to have occurred which are that Ms. Brown was traveling behind [the victim] allegedly in a reckless manner but ultimately resulted in a collision and ultimately the death of [the victim].

5

The court also reasoned that evidence of the victim's marijuana use or failure to wear a seatbelt would only confuse or mislead the jury on the issue of proximate cause.

###### 2. The District Court Did Not Abuse Its Discretion by Excluding Evidence That the Victim Had Marijuana in Her System

¶ 14 Brown contends that the district court erred by excluding evidence that the victim had marijuana in her system.[2] She argues that the victim's marijuana use was relevant because it made it more probable that the victim's own conduct was the sole cause of the accident. She asserts that the victim's marijuana use did not have to be an intervening cause for the evidence to be admissible. Alternatively, she asserts that the victim's marijuana use constituted an intervening cause because it amounted to unforeseeable gross negligence. Brown also contends that the court

---

[2] On appeal, the People contend that there was no evidence that the victim drove intoxicated, but a document attached to the presentence investigation report reflects that the victim's blood contained "10 ng/mL" of "Delta-9 THC," which is sufficient to presume the victim was driving under the influence. *See* § 42-4-1301(6)(a)(IV), C.R.S. 2025 (it can be presumed that a driver is under the influence of drugs if their blood contains five or more nanograms of delta-9 THC).

infringed on her constitutional right to present a complete defense by excluding the evidence. We are not persuaded.

¶ 15    Except where "otherwise provided by constitution, statute, or rule, all relevant evidence is admissible." *People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002) (citing CRE 402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. But under CRE 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

¶ 16    A person commits criminally negligent homicide when they "cause[] the death of another person by conduct amounting to criminal negligence." § 18-3-105, C.R.S. 2025. "A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, [the person] fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(3), C.R.S. 2025.

¶ 17    "A defendant's conduct is a cause of a victim's death in a criminal homicide if the conduct 'began a chain of events the natural and probable consequence of which was the victim's death.'" *People v. Reynolds*, 252 P.3d 1128, 1131 (Colo. App. 2010) (quoting *People v. Lopez*, 97 P.3d 277, 280 (Colo. App. 2004)).  In this way, the defendant's conduct must not only be a cause of the victim's death, but it must also be a proximate cause of the victim's death.  *Lopez*, 97 P.3d at 280 ("Proximate cause . . . means a cause which in natural and probable sequence produced the claimed injury.  It is a cause without which the claimed injury would not have been sustained." (quoting *People v. Stewart*, 55 P.3d 107, 116 (Colo. 2002))).  There can be more than one proximate cause of a victim's death, and a "defendant's conduct does not have to be the only, nearest, or last cause of death, so long as it is a cause but for which the death would not have occurred."  *Id.*

¶ 18    A defendant cannot be held criminally responsible for causing a victim's death, however, "if the 'act of an independent person . . . destroys the causal connection between the defendant's act and the victim's injury.'"  *Reynolds*, 252 P.3d at 1131 (quoting *People v. Saavedra-Rodriguez*, 971 P.2d 223, 225-26 (Colo. 1998)).  To qualify

as an intervening cause that relieves a defendant of criminal liability, "an event must exhibit three qualities: (1) the defendant must not have participated in the event[;] (2) the event must not have been reasonably foreseeable[;] and (3) the event must have been a cause but for which the injury would not have occurred." *People v. Beverly*, 2025 CO 18, ¶ 25. An intervening cause interrupts the natural and probable sequence of events from the defendant's conduct; it destroys the causal connection between the defendant's conduct and the victim's injury and becomes the cause of the victim's injury. *Lopez*, 97 P.3d at 282.

¶ 19 To assert that a victim's contributory negligence caused their own death, the defendant must show that the victim's conduct amounted to an intervening cause. *See id.* at 281 ("A victim's contributory negligence is not a defense to a vehicular homicide charge unless the negligence was an intervening cause." (citing *People v. Dunhill*, 570 P.2d 1097, 1098 (Colo. App. 1977))). Simple negligence is foreseeable and does not constitute an intervening cause. *Stewart*, 55 P.3d at 121. But gross negligence is unforeseeable and can be an intervening cause. *Id.* "Gross negligence is abnormal human behavior that constitutes 'an

9

extreme departure from the ordinary standard of care.'" *People v. Smoots*, 2013 COA 152, ¶ 10 (quoting *Lopez*, 97 P.3d at 282), *aff'd sub nom., Reyna-Abarca v. People*, 2017 CO 15; *see Martinez v. People*, 2024 CO 6M, ¶ 14 ("Gross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others." (citation omitted)).

¶ 20    Here, it was undisputed that the victim's own driving conduct was the nearest or last cause of the accident that killed her. The district court admitted evidence that the victim was speeding, talking on the phone, and changed lanes too closely to Brown's car, clipping the front of Brown's car and sending the victim's car into oncoming traffic. But the prosecution's theory at trial was that, but for Brown following the victim, the victim would not have driven the way she did. It was undisputed that Brown followed the victim in her car until the victim crashed, even if it was hotly disputed that Brown could be held criminally liable for doing so. Thus, whether the victim had marijuana in her system (or drove intoxicated) was only relevant to causation if it was an intervening cause because only an act that broke the chain of events that began when Brown

10

followed the victim would make it less probable that Brown was criminally liable for the victim's death. *See Lopez*, 97 P.3d at 282.

¶ 21    To begin with, the victim's use of marijuana was not an "intervening" act because it occurred before Brown's unlawful conduct. *See Auman v. People*, 109 P.3d 647, 663 (Colo. 2005) (third party's methamphetamine use occurred before the defendant's unlawful conduct so it could not constitute an intervening cause); *Stewart*, 55 P.3d at 121 (third party's grossly negligent act occurred before the defendant's unlawful conduct so the act "would not constitute a 'break' in the causal chain launched by [the defendant]'s misconduct" and therefore could not be an intervening cause).

¶ 22    There was also no evidence that the victim's marijuana use was an event "but for which the injury would not have occurred." *Beverly*, ¶ 25. The victim's death did not result from marijuana use. And there was no evidence that the victim would have avoided the accident if she did not have marijuana in her system. *See Saavedra-Rodriguez*, 971 P.2d at 227 ("[I]n order to discharge a defendant of liability for homicide, an intervening act must be" an act "but for which the victim would not have died."); *see also Lopez*,

11

97 P.3d at 281 (The victim's failure to use a seatbelt "had nothing to do with [the] defendant's driving conduct," "was not a contributing factor in the collision of the two vehicles," and "would not have caused [the victim's] death in the absence of [the] defendant's reckless driving."). In other words, there was no evidence that the victim drove the way she did *because she used marijuana.*

¶ 23 To the extent Brown argues that the intervening event was not the victim's use of marijuana but *her choice to drive after using marijuana,* we conclude that the event still does not constitute an intervening cause. Brown participated in the event by chasing after the victim in her car. *See Reynolds,* 252 P.3d at 1131 ("[W]hen a later event contributes to the outcome, but would not have occurred but for the defendant's own conduct, the later event is not independent of the defendant's conduct and does not operate to relieve the defendant of liability."). And absent evidence that the victim's marijuana use actually impacted her driving, we cannot say that the court erred by determining that the victim engaged in foreseeable simple negligence, not gross negligence, by driving with marijuana in her system. *See Martinez,* ¶ 39 ("Acts aren't inherently unforeseeable because they exceed the law's limits.").

12

¶ 24   We conclude that the district court did not abuse its discretion

when it determined that evidence that the victim had consumed

marijuana was not relevant because it was not an intervening

cause.  *See Zapata,* ¶ 25; *Liggett,* ¶ 16.  Relatedly, we perceive no

error in the court's reasoning that admitting the evidence would

have confused the jury because it could not have, as a legal matter,

relieved Brown of liability.  Thus, we also conclude that the court

did not abuse its discretion by excluding the evidence under CRE

403.  *See Zapata,* ¶ 25; *Liggett,* ¶ 16.  And because we conclude

that the court did not err by excluding the evidence, we conclude

that the court did not violate Brown's constitutional right to present

a defense.  *See People v. Elmarr,* 2015 CO 53, ¶ 27 ("[T]he right to

present a defense is generally subject to, and constrained by,

familiar and well-established limits on the admissibility of

evidence."); *People v. Salazar,* 2012 CO 20, ¶ 17 (the constitutional

right to present a defense "requires only that the accused be

permitted to introduce all relevant and admissible evidence").

## C.   Expert Testimony

¶ 25   Brown contends that the district court erred by allowing an

expert to (1) speculate as to the victim's state of mind and (2) usurp

13

the role of the jury by opining on causation. We perceive no reversible error.

### 1. Additional Background

¶ 26 At trial, Officer Justin Thull testified as an expert in accident investigation and accident reconstruction without objection. During direct examination, the prosecutor asked Officer Thull "What necessitated [the victim's] lane change?" Defense counsel objected based on speculation and the district court said, "Overruled. [The prosecutor] can lay further foundation."

¶ 27 The prosecutor then asked if Officer Thull had reviewed the other officers' reports, watched the HALO camera footage, and reviewed the crime scene photographs to reconstruct the accident. The officer responded that he had and that it was all relevant for accident reconstruction because

> [y]ou can't just solely look at the precise moment that those cars came together. You have to kind of work backwards and figure out why those two cars were where they were or why they were performing the movements or actions that they were at that time.
>
> [The victim] was moving to the left because she was traveling — from the HALO camera — faster than this uninvolved vehicle that was in front of her. So it looked like to me that she

was going to pass that uninvolved vehicle. She moved over at the time because she needed to pass.

> But Ms. Brown was in that location, and the contact was created, in essence, because Ms. Brown was following her around trying to get her attention or stop her movement or general nuisance of her getting from point A to point B.

> And Ms. Brown put herself in that position for the contact to occur by her driving behavior prior to the contact occurring.

Defense counsel did not object.

¶ 28    On redirect examination, the prosecutor asked Officer Thull, "[B]ased on your review of the investigation, what was going on when [the victim] had to make the decision about whether to move right, whether to move left, whether to apply the brakes?" The officer responded,

> [The victim] had been . . . followed, honked at, blocked, cut off. She was on the phone; so she was distracted by trying to answer questions, trying to see where she was going, looking at where Ms. Brown was.

> There's a whole bunch of things that could have been involved in her decision making to make that left as opposed to making a right.

> I can't say completely, but those are some events that could have been occurring and going through her mind when she made the decision to move to the left to pass that car.

15

Defense counsel did not object.

¶ 29    Officer Thull also testified, without objection, "[t]hat at any time during that following, chasing, cutting off, confrontation, Ms. Brown could have stopped and discontinued that confrontation and . . . the left lane movement would not have occurred at all because Ms. Brown would not have been in the vicinity."

### 2. Brown Did Not Preserve Her Contentions

¶ 30    We first conclude that Brown's contentions are not preserved. Although defense counsel initially objected to the prosecutor's question about why the victim changed lanes on the basis that it was speculative, the district court's ruling effectively sustained the objection by requiring the prosecutor to lay additional foundation. After the court "overruled" the objection, the witness did not answer the question; instead, the prosecutor asked additional questions to lay further foundation. Even so, because counsel did not object again — either to the prosecutor's questions or to Officer Thull's answers — Brown's challenge to Officer Thull's direct testimony is unpreserved. *See People v. Douglas*, 2012 COA 57, ¶ 61 (concluding an issue was not preserved when no contemporaneous objection appeared in the record); *Martinez v. People,* 2015 CO 16,

¶ 14 (a timely and specific objection is necessary to allow the "trial court a meaningful chance to prevent or correct the error").

¶ 31 Defense counsel also failed to object to the challenged testimony on redirect examination. The objection to speculation made during direct examination — almost forty pages of transcript earlier — was insufficient to alert the court to a potential error. *See Douglas*, ¶ 61; *Martinez*, ¶ 14. And counsel never objected on the grounds that the officer usurped the role of the jury (or improperly opined on Brown's veracity, to the extent that issue is raised on appeal). *See Douglas*, ¶ 61. Accordingly, we review Brown's contentions for plain error. *See Hagos*, ¶ 14.

### 3. The District Court Did Not Plainly Err by Allowing the Expert Testimony

#### a. Speculative Testimony

¶ 32 Brown contends that Officer Thull's redirect testimony had no analytically sound basis — "instead, Officer Thull merely guessed about what could have been going through [the victim's] mind when she changed lanes and hit Brown." We perceive no plain error.

¶ 33 CRE 702 allows for the admission of qualified expert testimony if it will assist the trier of fact to understand the evidence or to

determine a fact in issue. The focus of a Rule 702 inquiry is whether the proffered evidence is both reliable and relevant. *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001).

¶ 34  Expert testimony "that has no analytically sound basis" is unreliable and inadmissible. *People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007). But "[t]estimony is not speculative simply because [it] is in the form of an opinion or stated with less than certainty, i.e., 'I think' or 'it is possible.'" *Id.* As a result, to determine if an expert's testimony is unreliable, "it is not enough for a [district] court to conclude that the testimony is 'speculative'"; instead, the court must determine "whether the scientific principles underlying the testimony are reasonably reliable, and whether the expert is qualified to opine on such matters." *Id.* at 379.

¶ 35  At the time of the trial, Officer Thull had been a police officer for twenty-one years and had worked in the traffic division as a training coordinator teaching accident investigation, training the police department on new accident reporting systems, and helping other officers with accident reconstructions. He completed three levels of an accident reconstruction course that covered what to look for in an initial investigation, how to determine the speeds of

two cars when they collide, and how to reconstruct an accident. He had also taken another sixteen-hour class about how to gather data from a vehicle and a forty-hour class on how to analyze and interpret the data and apply it to an accident.

¶ 36    During direct examination, Officer Thull identified the evidence he had reviewed and explained that he had to work backwards to "figure out why those two cars were where they were or why they were performing the movements or actions that they were at the time." Officer Thull then explained what he observed about the maneuvers of the victim's vehicle in the moments leading up to the crash.

¶ 37    During cross-examination, defense counsel asked Officer Thull whether the victim "could have simply braked and slowed behind" the car in front of her "like anyone else in traffic" but "chose not to" slow down and instead "chose to change lanes." The officer responded affirmatively. Counsel also asked whether the victim could have moved into the right lane instead of the left lane, noting

that "the accident would not have occurred" if she had done that. Again, the officer agreed.[3]

¶ 38     On redirect, the prosecutor directed Officer Thull's attention to the questions defense counsel had asked about other maneuvers the victim could have made besides trying to change lanes in front of Brown.  The officer relied on his accident reconstruction experience and drew inferences from the evidence to reach a conclusion as to why the victim changed lanes the way she did.  *See id.* at 378-79 (expert testimony that shows "the method employed by the expert in reaching the conclusion is scientifically sound," whereas "expert testimony that is connected to existing data only by a bare assertion resting on the authority of the expert" may be rejected).  He opined that the victim was distracted by talking to police and worrying about Brown, who had "followed, honked at, blocked, [and] cut off" the victim.  Notably, Officer Thull did not give

---

[3] To the extent Brown contends that the district court erroneously prevented defense counsel from cross-examining Officer Thull on whether the victim could have complied with her "legal duty" to check for Brown's car before changing lanes even if she was distracted by Brown's driving, we perceive no error.  It would have been improper for the officer to opine on the applicable law or the victim's compliance with it.  *See People v. Baker*, 2021 CO 29, ¶ 32.

a single, definitive opinion as to why the victim changed lanes. Instead, he listed several factors that could have contributed to the victim's decision.[4]

¶ 39    Defense counsel did not challenge Officer Thull's accident reconstruction expertise or the method by which he reached his opinions.  During cross-examination, defense counsel highlighted other choices the victim could have made to avoid clipping Brown's vehicle.  And on redirect, Officer Thull drew on his expertise to identify facts in evidence that could have contributed to the victim's decision.  Under these circumstances, we conclude that the officer's opinion was not speculative.  At a minimum, it would not have been obvious that his testimony lacked a sound scientific basis, so the district court did not plainly err by admitting it.  *See id.*; *Pollard*, ¶ 39; *Campbell*, ¶ 25.

---

[4] We decline to address Brown's argument, raised for the first time in her reply brief, that the district court deprived defense counsel of the opportunity to challenge Officer Thull's redirect testimony.  *See People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003) (declining to consider an argument presented for the first time in a reply brief).

### b.    Usurping the Role of the Jury

¶ 40    Brown next contends that the district court erred by allowing Officer Thull to testify that Brown's behavior caused the accident resulting in the victim's death because that testimony usurped the role of the jury in determining causation.  Again, we perceive no plain error.

¶ 41    Experts may offer testimony that embraces the ultimate issue to be decided by the jury, but they may not usurp the role of the jury.  *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).  To determine whether expert testimony usurped the jury's role, we consider several nonexhaustive factors, including whether

> (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion of the applicable law or legal standards and thereby usurped the function of the court; (3) the jury was properly instructed on the law and that it could accept or reject the expert's opinion; and (4) the expert opined that the defendant had committed the crime or that there was a particular likelihood that the defendant did so.

*People v. Baker*, 2021 CO 29, ¶ 32 (citing *Rector*, 248 P.3d at 1203).

¶ 42    Officer Thull testified that, although the fatal crash was caused by the victim changing lanes and clipping the front of

Brown's vehicle, the contact occurred because of Brown's "following, chasing, cutting off, [and] confront[ing]" the victim. This testimony undoubtedly spoke to an element of criminally negligent homicide — causation. But we conclude that it did not usurp the jury's role because it is undisputed that (1) Officer Thull never opined that Brown committed any offense; (2) he never opined on the legal definition of causation; and (3) the jury was properly instructed that Brown had the presumption of innocence, the prosecution alone had the burden to prove each element of the offenses beyond a reasonable doubt, the jurors were the sole judges of witness credibility and the weight to give the evidence, and the jurors were not bound by an expert's testimony. The court also properly instructed the jury that "cause" meant "an act which in natural and probable sequence produced the claimed injury" and "without which the claimed injury would not have happened."

¶ 43    We are not persuaded otherwise by Brown's argument that Officer Thull's testimony "opined on the truth of the prosecution's factual allegations." Although Officer Thull's testimony bolstered the prosecution's case, that did not make it inadmissible. Indeed, if the evidence did not make it more or less probable that the events

23

occurred as the prosecution alleged, the testimony would not have been relevant. *See* CRE 401. And the mere fact that Brown testified to a different version of events than what Officer Thull perceived or was told during his investigation does not mean that he improperly opined on her credibility. *See People v. Relaford*, 2016 COA 99, ¶ 30 ("[E]xpert testimony generally tends to bolster or attack the credibility of another witness," but that "alone is insufficient to deny admission of the evidence." (quoting *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986))).

¶ 44 At a minimum, we conclude that it would not have been obvious to the district court that the officer usurped the role of the jury, so the court did not plainly err by allowing his testimony. *See Pollard*, ¶ 39; *Campbell*, ¶ 25.

## D. Text Messages

¶ 45 Brown contends that the district court abused its discretion by admitting text messages that contained inadmissible character evidence, were irrelevant under CRE 401, and were unfairly prejudicial under CRE 403. We disagree.

## 1. Applicable Law

¶ 46    CRE 404(b) provides that evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character" but may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

¶ 47    To determine whether evidence of uncharged misconduct is admissible, we must first determine whether it is intrinsic or extrinsic to the charged offenses. *Rojas v. People*, 2022 CO 8, ¶ 52. "Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it." *Id.* Because intrinsic acts are not "other" crimes, wrongs, or acts, a trial court need not conduct a CRE 404(b) analysis when deciding whether to admit the evidence. *Id.* Instead, the court should evaluate the admissibility of intrinsic evidence under CRE 401-403 and other ordinary evidentiary principles. *Id.*

¶ 48    In contrast, extrinsic evidence that suggests bad character may be admitted only as provided by CRE 404(b) and after a *Spoto*

analysis.  *Id.*; *People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990). But if extrinsic evidence does not suggest bad character, CRE 404(b) does not apply.  Instead, its admissibility is governed by CRE 401-403 and ordinary evidentiary principles, just like intrinsic evidence.  *Id.*

## 2.    Additional Background

¶ 49    At trial, the prosecutor moved to admit text messages between the victim and T.B., Brown's sister-in-law and the victim's friend. The texts contained the following messages from T.B. to the victim:

- "The shit is out, and it's going to be bad."

- "You better be real careful."

- "I don't think you understand the seriousness of this."

- "This child is mad as fuck, she knows every time he has been at your house.  She has it time stamped."

- "She is going to fight for her place."

¶ 50    Defense counsel objected on the basis that the messages constituted prejudicial character evidence.  The prosecutor argued that the messages were relevant to show the effect on the victim. The district court told the prosecutor to lay further foundation. After additional questioning, the prosecutor again moved to admit

the text messages, and defense counsel argued the texts were not relevant and were prejudicial.[5]

¶ 51    The court ruled, in relevant part, that "[t]he text messages are relevant in that they are a conversation between [T.B.] and [the victim] regarding [T.B.'s] knowledge that [Brown] is upset with [the victim] and is actively looking for her.  And this precipitates the date of offense by one day."  The court explained that, although there may be "prejudicial components to the substance of the messages, the [c]ourt does find that they are more probative than prejudicial."

### 3.    The District Court Did Not Abuse Its Discretion by Admitting the Text Messages

¶ 52    Brown contends that the district court abused its discretion by admitting the text messages because the texts (1) contained inadmissible character evidence and (2) were irrelevant under CRE 401 and inadmissible under CRE 403.  We are not persuaded.

---

[5] Brown also argued during trial that the text messages should be excluded as hearsay, but she does not reassert that argument on appeal, so we deem it abandoned.  *See People v. Hunsaker*, 2020 COA 48, ¶ 10, *aff'd*, 2021 CO 83.

## a.    Character Evidence

¶ 53    To the extent Brown contends that the district court erroneously admitted the text messages under the abolished res gestae doctrine, rather than conducting a proper CRE 404(b) analysis, we conclude that the argument was not preserved and is not developed on appeal.[6]  Although defense counsel filed a motion in limine to exclude "character evidence" and asserted at trial that the text messages contained "character evidence," counsel did not ask the court to conduct a CRE 404(b) or *Spoto* analysis, nor did counsel frame the argument in those terms.  *See People v. Melendez,* 102 P.3d 315, 322 (Colo. 2004) (a defendant must raise an issue and provide a trial court with "an adequate opportunity to make findings of fact and conclusions of law"); *see also* CRE 404(b).  Thus, the issue is not preserved.

¶ 54    But even if counsel's assertion that the messages contained "prejudicial character evidence" preserved the issue, Brown does

---

[6] To argue that the district court admitted the evidence under the res gestae doctrine, Brown appears to be relying upon the court's pretrial ruling that the text messages' "probative value" was to "explain and to place into context" the events that occurred.  But Brown never raised an objection on the basis that the court was improperly relying on the res gestae doctrine.

not explain on appeal how the text messages were extrinsic other acts evidence subject to a CRE 404(b) or *Spoto* analysis, nor does she conduct that analysis to demonstrate that the court erred. Thus, we decline to address Brown's "character evidence" arguments further. *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49 (declining to address a defendant's conclusory and underdeveloped argument), *aff'd*, 2025 CO 2.

### b. CRE 401 and CRE 403

¶ 55    Brown argues that the text messages offered "minimal, if any[,] probative value showing Brown's motive for approaching [the victim]" because Brown did not dispute that she wanted to speak with the victim about the affair when she went to the victim's house.  But a defendant "'may not stipulate or admit [her] way out of the full evidentiary force of the case as the [prosecution] chooses to present it.'" *People v. Morales*, 2012 COA 2, ¶ 9 (second alteration in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)).  And Brown never admitted she was angry or wanted to confront the victim as the text messages showed.

¶ 56    Brown testified that she was driving normally and did not honk at, tailgate, or threaten the victim, or do anything else to

make the victim stop.  Yet other evidence contradicted that account.  One witness said it looked like Brown's Suburban was chasing the victim's car.  And T.B. testified that she was on the phone with Brown when Brown was following the victim and could hear Brown "screaming" at the victim to pull over.  Given the conflicting evidence, the text messages made it more probable that Brown pursued the victim aggressively, as the other witnesses described, rather than calmly following her and politely asking her to talk, as Brown testified.  *See* CRE 401; *Vialpando v. People*, 727 P.2d 1090, 1096 (Colo. 1986) (we consider "whether the fact of consequence for which the evidence is offered is being disputed").

¶ 57     The text messages also reflected Brown's motive.  "'[M]otive is always relevant' to establish whether the defendant committed the charged act and why, and may also explain otherwise unexplainable behavior."  *People v. Delsordo*, 2014 COA 174, ¶ 14 (quoting *Wagman v. Knorr*, 195 P. 1034, 1035 (Colo. 1921)).  The evidence was also relevant to show Brown's mental state because the highest charge of vehicular homicide required the prosecution to prove that Brown drove her car recklessly.  § 18-3-106(1)(a), C.R.S. 2025.

¶ 58    We also reject Brown's argument that the text messages were unfairly prejudicial because of the danger the jury would assume that Brown went to the victim's house with "violent intent."

¶ 59    "All relevant and admissible evidence is 'inherently prejudicial'" to at least one of the parties. *People v. Kembel*, 2023 CO 5, ¶ 53 (citation omitted). And "any evidence that strengthens the prosecution's case carries with it some degree of disadvantage to an accused." *People v. Garner*, 806 P.2d 366, 375 (Colo. 1991). "[U]nfair prejudice within the meaning of the rule still refers only to 'an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis' and does not mean prejudice that results from the legitimate probative force of the evidence." *Rath*, 44 P.3d at 1043 (citation omitted). And when we review a trial court's ruling under CRE 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Clark*, 2015 COA 44, ¶ 18 (citation omitted).

¶ 60    From the legitimate probative force of the text messages, a reasonable jury could conclude that Brown was upset, had a motive for going to the victim's house, and pursued the victim aggressively,

31

putting in motion a chain of events culminating in the victim's death. Brown has not demonstrated that the prejudice to her from admitting this evidence was *unfair* prejudice. *See Rath*, 44 P.3d at 1043. Affording the evidence its maximum probative value and its minimum unfair prejudice, *see Clark*, ¶ 18, we conclude that the court did not abuse its discretion by admitting the text messages.

## III. Cumulative Error

¶ 61 Brown contends that, even if the alleged errors do not individually require reversal, their cumulative prejudicial impact does. But because we have found no error, the cumulative error doctrine does not apply. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25 ("For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."); *People v. Shanks*, 2019 COA 160, ¶ 76 (cumulative error doctrine only applies when multiple errors were committed).

## IV. Disposition

¶ 62 We affirm the judgment.

JUDGE FOX and JUDGE MEIRINK concur.